<pre>
 1                IN THE UNITED STATES DISTRICT COURT
                    NORTHERN DISTRICT OF ILLINOIS
 2                        EASTERN DIVISION

 3  NICHOLAS POLLETTA,              )   Docket No. 16 C 9492
                                    )
 4                Plaintiff,        )
                                    )
 5           v.                     )
                                    )
 6  THOMAS DART, Sheriff of Cook    )
    County; and COOK COUNTY,        )
 7  ILLINOIS,                       )
                                    )
 8                Defendants.       )
    --------------------------------
 9  GERALD HACKER,                  )   Docket No. 17 C 4282
                                    )
10                Plaintiff,        )
                                    )
11           v.                     )   Chicago, Illinois
                                    )   July 5, 2018
12  THOMAS DART; COOK COUNTY,       )   2:00 o'clock p.m.
    ILLINOIS; SABRINA RIVERO-       )
13  CANCHOLA; D. SANDOVAL,          )
                                    )
14                Defendants.       )

15           TRANSCRIPT OF PROCEEDINGS - MOTION
              BEFORE THE HONORABLE JOHN Z. LEE
16
    APPEARANCES:
17
    For the Plaintiff:          THOMAS G. MORRISSEY, LTD., by
18                              MR. THOMAS GERARD MORRISSEY
                                MR. PATRICK WILLIAM MORRISSEY
19                              10150 South Western Avenue
                                Suite Rear
20                              Chicago, Illinois 60643

21

22              ALEXANDRA ROTH, CSR, RPR
                 Official Court Reporter
23              219 South Dearborn Street
                      Room 1224
24              Chicago, Illinois 60604
                   (312) 408-5038
25
</pre>

```
 1   APPEARANCES:  (Continued)

 2   For Sheriff Defendants:        SANCHEZ DANIELS & HOFFMAN LLP, by
                                    MS. YIFAN XU SANCHEZ
 3                                  333 West Wacker Drive
                                    Suite 500
 4                                  Chicago, Illinois 60606

 5   For Defendant Cook County:     OFFICE OF THE COOK COUNTY STATE'S
                                    ATTORNEY, by
 6                                  MS. JESSICA MEGAN SCHELLER
                                    69 West Washington Street
 7                                  20th Floor
                                    Chicago, Illinois 60601
 8

 9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

1    (Proceedings had in open court:)

2         THE CLERK:  16 CV 9492, Polletta v. Dart.  And

3    17 CV 4282, Hacker v. Dart.

4         MR. T. MORRISSEY:  Good afternoon, your Honor.  Thomas

5    Morrissey on behalf of Mr. Polletta and Mr. Hacker in the

6    Hacker versus Dart case.

7         MR. P. MORRISSEY:  Good morning.  Patrick Morrissey on

8    behalf of the plaintiffs.

9         MS. SANCHEZ:  Good afternoon, your Honor.  Yifan

10   Sanchez, special assistant state's attorney, for the sheriff

11   and individual sheriff defendants.

12        MS. SCHELLER:  Good afternoon, your Honor.  Assistant

13   State's Attorney Jessica Scheller appearing on behalf of

14   Cook-County in both matters.

15        THE COURT:  All right.  This is oral argument with

16   regard to the motion for class certification in the two

17   matters.  First of all, we'll deal with the Hacker case.  Okay?

18   And I will hear from the plaintiffs first, and defense counsel

19   can take a seat, if you like.

20        I like the fact that you are all sitting in one table.

21   That shows good solidarity.

22        All right.  Mr. Morrissey, at the last status hearing

23   I voiced some concerns and raised some issues.  We can start

24   with those.  Or you can go ahead and start wherever you like to

25   start.

1          MR. T. MORRISSEY:  Well, perhaps it's best that the

2   Court address the issues that you are concerned with.

3          THE COURT:  So if I understand it, upon entry an

4   individual inmate, if they have a hearing impairment, is

5   designated either as hard of hearing or deaf by the county.

6          You can have a seat.

7          MR. T. MORRISSEY:  That's correct, your Honor.  Do you

8   want us to sit down or stand?

9          THE COURT:  No, no, I was asking defense counsel to

10  have a seat.  She was standing up.

11         And I understand that Mr. Hacker has been designated

12  as being hard of hearing, is that correct?

13         MR. P. MORRISSEY:  He was actually hearing impaired.

14  They don't have a term hard of hearing.

15         THE COURT:  It's called hearing impaired.  Okay.  So

16  it's either deaf or hearing impaired.  Got it.

17         MR. T. MORRISSEY:  The more technical is hearing --

18  hard of hearing, but the jail uses hearing impaired.  But they

19  are the same.

20         THE COURT:  Okay.  So the designation that the jail

21  puts on them is hearing impaired.

22         MR. T. MORRISSEY:  That's correct.

23         THE COURT:  All right.  So we'll just use that term.

24  Okay?

25         And Mr. Hacker falls within the hearing impaired

1    group, and he has some ability to hear, is that correct?

2    MR. T. MORRISSEY:  That's correct, with a listening

3    device.

4    THE COURT:  And so one of the concerns I had was

5    whether or not Mr. Hacker is adequate to represent the

6    interests of those individuals who are designated as deaf as

7    part of this case.  And so I guess we can start from there.

8    MR. T. MORRISSEY:  Sure.  The case involves a general

9    policy of the jail as it relates to deaf and hard of hearing or

10   hearing impaired prisoners.  We learned during the oral

11   arguments in regards to Mr. Hacker's preliminary injunction

12   that auxiliary aids are not provided to deaf and hard of

13   hearing people.

14   The testimony of the ADA compliance director and the

15   person that was produced under 30(b)(6) is that if a person

16   comes in with a hearing aid or a listening device, they'll

17   allow them to maintain that in the jail.  However, and it's

18   very clear in their testimony, that if you don't have those

19   items and you come into the jail -- I think Ms. Rivera said,

20   there is nothing standing in the way of Mr. Hacker going out

21   and purchasing a hearing aid or listening device, but they are

22   not going to provide it.

23   And so in regards to a deaf person, auxiliary aids for

24   a deaf person might be sign language.  We're looking at the

25   regulations in this case, your Honor.  And under the ADA -- and

1   I believe the regulation is 130(b)(2).  And we addressed that

2   -- the Court addressed that in granting a preliminary

3   injunction.

4         THE COURT:  I guess, Mr. Morrissey, I understand that

5   from your perspective, you are attacking the same policy or

6   absence of policy or the failure to abide by current policy

7   with regard to the class.

8         But if you think about it in terms of what relief

9   would be adequate for the class, say with regard to the

10   injunctive class, or think about it in terms of the damages

11   class, kind of what relief would be -- would adequately remedy

12   the injuries of the class, they would all be different, right?

13         And so, for example, if the jail decided, okay, well,

14   so now what we're going to do is, we're going to provide the

15   class as you have defined it with an auxiliary hearing aid, the

16   type of which Mr. Hacker has, an ALD that he could put to his

17   ear so he could hear things that he cannot otherwise hear.

18   That wouldn't help someone who's deaf at all, right?

19         And so if you think in terms of the interests that

20   Mr. Hacker is trying to represent, and also think about it in

21   terms of, right -- when I think about cases like this and I

22   think about adequacy and typicality, I also think about a

23   hypothetical settlement negotiation, where Mr. Hacker is

24   participating in a settlement in the case, and where he might

25   be incentivized to agree to a certain level of auxiliary aid

1  assistance that would not provide people who are deaf with the
2  remedy or doesn't -- to address their particular injury.

3       And so that's where I have difficulty understanding
4  how Mr. Hacker could adequately represent the class.  I
5  understand that he and other members of the class are attacking
6  the fact that the jail is not providing anyone anything.  I get
7  that.

8       MR. T. MORRISSEY:  Correct.

9       THE COURT:  But when you start kind of breaking down
10 kind of what does that mean for this litigation going forward,
11 and what kind of remedy can be provided, and particularly as I
12 said if there are ongoing settlement discussions, you know,
13 what interest Mr. Hacker can defend, or whether he would be
14 incentivized to trade off certain rights to gain other rights,
15 that's where it appears to me that one begins to kind of see
16 the potential conflict between someone like Mr. Hacker, who is
17 hearing impaired, versus someone who may be deaf and require a
18 different type or additional type, more resource-intensive
19 assistance.

20      MR. T. MORRISSEY:  Well, I think we are looking at two
21 different forms of relief.  On the one hand you are addressing
22 injunctive, (b)(2).  And then there is the (b)(3) relief.  If
23 we talked about it in terms of (b)(3), cases involving jail
24 policies are typically -- are generally certified under (b)(3),
25 when you have a general policy.

1      In this case, across the board situation where
2  arguably, according to us, they're not following 130 --
3  35.160(b), in that they are not furnishing auxiliary aids.  So
4  deaf and hard of the hearing or hearing impaired people can
5  participate or have the benefit of services and programs.
6      So if we look at it under (b)(3), there is a whole
7  host of cases that the Court even cited in your Parish opinion,
8  Jackson versus Dart, Otero, which was Judge St. Eve's case
9  involving prisoners who were brought back after they were
10  discharged by a Judge, brought back to the jail with other
11  prisoners that had to remain in the jail.
12      And this Court and other Courts have said that under
13  (b)(3), those issues, individualized issues, such as causation,
14  can be dealt with separately in proceedings after there is a
15  decision whether or not there is illegal conduct by the
16  government.
17      So here we are specifically saying that what the jail
18  is doing is illegal under to the regulation that requires them
19  to furnish auxiliary aids.  So under (b)(3), I don't think
20  there will be a concern for the Court.
21      THE COURT:  What about people who bring their own ALDs
22  and are allowed to bring their own ALDs?  Would they be then
23  not part of that class?
24      MR. T. MORRISSEY:  They -- they have -- they don't
25  have a claim because they have been provided, they have been

1    furnished, an accommodation.  So they wouldn't be -- fall

2    within the class definition arguably.

3            THE COURT:  Okay.  So if they brought --

4            MR. T. MORRISSEY:  And in that case, your Honor, there

5    is testimony from -- under 30(b)(6), Ms. Rivera, that there was

6    only one person that was allowed to bring in an ALD.

7            THE COURT:  Okay.  So for people that -- for inmates

8    that were allowed to bring in their own ALD, those people would

9    not be part of the class as you envision it.

10           MR. T. MORRISSEY:  Correct, because they were provided

11   an --

12           MR. P. MORRISSEY:  Your Honor, there is also this

13   component of a TTY access.  And TTY access is -- covers both

14   deaf people and hearing impaired.

15           THE COURT:  Right.  But this is -- but, Mr. Morrissey,

16   what you bring up is just another complication in defining a

17   class so broadly, right?  Then you have people like Mr. Hacker

18   who wasn't provided an ALD or TTY.  And then you have people

19   who were allowed to bring their own ALD who weren't given a

20   TTY.

21           And by the way, I don't know whether if you have an

22   ALD whether you need a TTY or not.  Would you?

23           MR. T. MORRISSEY:  You would.

24           THE COURT:  So you can't use an ALD to listen to phone

25   calls?

1         MR. P. MORRISSEY:  Not from my understanding, because

2 you have -- Mr. Hacker always used a TTY.  It was -- from my

3 observation, interaction with Mr. Hacker, I don't believe --

4 it's like a microphone, your Honor, that is directed towards

5 the sound.

6         And I don't believe, based on the jail's phones that

7 they have in the dayroom, that it's feasible to pick up the

8 audio from using the assistive listening device.

9         MR. T. MORRISSEY:  Our definition, your Honor, says

10 they require -- they require an accommodation.  In your case,

11 if a person had an ALD, let's assume for argument's sake with

12 that ALD they could use the telephone without any other

13 assistance, any other auxiliary help, then they wouldn't be

14 somebody that would fit within the class definition because

15 they don't require an accommodation.  It's only people that

16 need an accommodation that would fall within the class

17 definition.

18         THE COURT:  So when you say -- for your class

19 definition when you say, require, you don't mean legally

20 require.  You mean that they need it to carry out -- to enjoy

21 the services provided by the facility.

22         MR. T. MORRISSEY:  Correct.  And the regulations talk

23 about the type of accommodation is -- is a matter of personal

24 preference.  And the public entity is supposed to try to

25 accommodate that, use the accommodation the person needs.

1      THE COURT: Okay. What about the injunctive relief

2  class then? With regard to the injunctive relief class, would

3  there be issues about typicality and commonality as to the

4  injunctive class?

5      MR. T. MORRISSEY: No, no.

6      THE COURT: What would I order? What would the

7  injunction be that you are requesting, that they just follow

8  the procedures with everyone?

9      MR. T. MORRISSEY: Well, Judge, can I step back a

10  minute and give you a little historical perspective on this

11  case?

12      We talked about the general order many times in this

13  case. And the general order, as we kind of noted, tracks the

14  regulations. But if we step back a little further, why did the

15  sheriff come up with this general order and not follow it?

16      What happened in 2012 -- and this just recently came

17  out in the deposition of the former executive director of the

18  jail. In 2012, the United States Justice Department stepped

19  in. And they saw a letter to the sheriff, and they said, hey,

20  you're not following -- you're not accommodating people with

21  disabilities at the jail. And part of the people that aren't

22  being accommodated are people that are having trouble

23  communicating.

24      So over a couple year period, the jail and the justice

25  department lawyers conversed, and they looked at different

1    aspects.  And they signed an agreement in 2015.  And I'd like

2    to provide a copy to the Court and to opposing counsel.

3        (Brief pause.)

4            MR. T. MORRISSEY:  And I'll hand it up to the Court.

5    Unfortunately I only have three copies.  But it's page 3 of the

6    implementation plan, your Honor.

7            And under the caption where it says, communications,

8    it talks about the sheriff addressing this by issuing the

9    general order that we've all seen, General Order 24.

10           And below that, your Honor, it talks specifically what

11   the general order addresses, including such -- it's --

12   including such issues as being provided the auxiliary aid of

13   your choice for religious services, having it for disciplinary

14   hearings, for very significant situations at the jail.

15           So the sheriff was on notice.  They drafted that

16   general order.  And unfortunately, your Honor, they didn't

17   follow it.  So from our evidence, your Honor, is the fact that

18   they -- the justice department tried to fix it.  They made a

19   very specific order.  And the sheriff came in, and they drafted

20   the general order.

21           They didn't fix it.  So under Rule 20 -- under (b)(2),

22   your Honor, we're asking this Court just to have them fix it,

23   fix it, based upon compliance with what they promised the

24   United States government, and what they promised in their

25   general order, your Honor:  Provide these general auxiliary

1   aids so that people that are deaf and hard of hearing can

2   communicate during significant proceedings.

3       It's our position that under (b)(2), if they followed

4   the sheriff's own general order, and the Court ordered them to

5   do such, that would resolve the general common issue in this

6   case that they are not furnishing auxiliary aids as required by

7   the regulations to deaf and hard of hearing people.

8       In regards to whether Mr. Hacker is an appropriate

9   class rep, adequate to represent people that are deaf, I don't

10  know if the Court recalls.  But back in the fall of 2017, we

11  filed a case, Reyes versus Dart, involving Mr. Reyes.  Mr.

12  Reyes' case is pending before Judge Feinerman.  We asked it to

13  be made related here.  Mr. Reyes is deaf.  And he requires sign

14  language.  He also can be assisted with an ALD.

15      When we -- the Court denied the relatedness motion, we

16  then proceeded in front of Judge Feinerman.  We got somewhat

17  identical rulings on preliminary injunction.  For one, Mr.

18  Reyes also, same common issue, was not being provided a TTY

19  communication at all.  He had been in there for six or eight

20  months without being able to make a phone call to his family.

21  Judge Feinerman -- and they agreed eventually to provide him

22  with TTY access on a daily basis.

23      We also note in Reyes and in this case, sheriff has a

24  policy that even when they provide it, they don't provide it on

25  weekends.  They don't provide it when the correctional

1   rehabilitation worker isn't present.  These are common issues

2   that can be addressed in one ruling by a Court.

3          In addition, Mr. Reyes had the problem -- has the

4   problem -- had the problem in regards to having the ability to

5   talk to his sister, who came frequently to see him.  And for

6   the first eight months he couldn't communicate with his sister.

7          Finally when he was given -- ordered by -- when they

8   were ordered by the court to provide an ALD for family visits,

9   now he can visit with his family.

10          The other -- the other matter, your Honor, was the

11   fact that there are all kinds of programs and services provided

12   for inmates at the jail.  Mr. Reyes is a very religious person.

13   He wasn't allowed to go to Hispanic Christian services, which

14   are conducted once or twice a week.  Now, he was allowed to go

15   to them, your Honor.  But he wasn't able to benefit from the

16   Christian services.

17          Also he wanted to take part in -- in treatment for his

18   alcohol.  And they have a program, what is it, the Alcohol

19   Anonymous, that's at the jail in division -- he was in Division

20   10.  He couldn't really benefit from those meetings.

21          And so we brought a preliminary injunction motion in

22   front of Judge Feinerman, and we got the listening device.  So

23   when he attends religious services and when he goes to these

24   meetings once or twice a week, he can participate.

25          But it shouldn't be necessary, your Honor, that --

1  we're dealing with a group of people, your Honor, that don't

2  have ready access to lawyers.  They're confined.  But we know

3  from the medical providers at the jail, we're dealing with at

4  least over 35 or 40 deaf people.  In fact, that's a staggered

5  amount.  It keeps increasing because obviously the population

6  is fluid.

7        We also know that hearing impaired is significant,

8  well over the mandated 40.  And I think we pointed out 60 or 65

9  back -- back in October.

10        So should every person who wants to make a phone call

11  or have a TTY phone call with a family member have to bring

12  their own lawsuit, find a lawyer that will take the case and do

13  it?  Should every person who wants to meet with their family

14  members have to file a lawsuit?  Should the -- the ability to

15  benefit from programs and services like religion and -- and

16  alcohol treatment, should that be dependent upon the ability to

17  hire a lawyer, bring a separate lawsuit?  I don't think so.

18        And that's why I think it really -- I understand that

19  there are variances, your Honor.  But we have here a general

20  order.  We have the federal government trying to address it in

21  an implementation plan.  If we had an order, I think one order

22  from the Court, assuming you're able to find that the jail

23  was -- conduct was illegal under the ADA -- if we had one

24  order, your Honor, that said, I'm ordering you to comply with

25  the general order of the sheriff, that would be sufficient for

1     (b)(2).

2          And it wouldn't involve whether or not any issue --

3     whether Mr. Hacker's situation varied from Mr. Reyes' or

4     somebody else.

5          THE COURT:  Because you're saying, what's common in

6     all these situations is that the jail is just not following the

7     general order?

8          MR. T. MORRISSEY:  That's correct, your Honor.  And

9     the general order tracks the ADA regulations.  And it was

10    provided to the justice department as their -- their method to

11    comply with the ADA regulations.

12         THE COURT:  All right.  Thank you, Mr. Morrissey.

13         I will hear from defendants?

14         MS. SCHELLER:  Good afternoon again, your Honor.

15    Jessica Scheller on behalf of Cook County.

16         Would you like for us to respond to plaintiff?  Or do

17    you have specific questions?

18         THE COURT:  No, please start by responding.

19         MS. SCHELLER:  I like to take up first the very last

20    thing that counsel argued with regard to evidence that the jail

21    or the county medical staff were not following the policy.  And

22    that simply is not borne out by any of the briefing, the motion

23    for class certification or discovery in this case.

24         When we began this case and when plaintiff first

25    obtained the preliminary injunctions, that was well before much

1    of the discovery had been completed.  What discovery has borne

2    out is that Mr. Hacker's disability is accommodated.  Medical

3    staff speaks into his ear of preference, where he has the

4    greatest hearing.  The medical records reflect that he repeats

5    back to them his course of care, and that communication is

6    effective and it's done according to his preferences.

7            So I think there is something of a dearth of evidence

8    to support plaintiff's premise that the jail and medical staff

9    aren't following the ADA or the terms of the general order.

10           The second thing I like to raise is that I question

11   the validity of plaintiff's attempt to assert privileges under

12   the DOJ supervision of Cook County's medical staff and the

13   jail's staff because I don't believe it gives rise to a private

14   right of action.  And I think that's been pretty well decided

15   well and over in the last few years in this -- in this

16   jurisdiction.

17           But beyond that, in going to the heart of what the

18   Court was asking plaintiff about, which is, is Mr. Hacker a

19   typical class representative?  Is his experience common?  And

20   this will all be borne out on summary judgment, but the answer

21   to that question is, no.

22           The medical providers who have treated him, and

23   specifically the ENT who treated him from Stroger on an

24   audiology consult, testified that while he is hearing impaired,

25   he would not benefit at all from an assistive listening device

1    based upon the nature of his hearing loss, which is, he has a

2    hearing loss which has some differentiation issues, meaning he

3    hears Charley Brown's mom.  He can't hear the consonants or the

4    vowels.  And thus, providing him with an assistive listening

5    device just to make that particular sound amplified would be of

6    zero benefit to Mr. Hacker.

7              So I don't think that his experience is common or

8    typical.  And I think that that is borne out by the record in

9    this case.

10             The other issue I like to raise is that the

11   plaintiffs --

12             THE COURT:  It's borne out by the record, but -- it

13   may be borne out by the record.  But that wasn't part of the

14   briefing, right?

15             MS. SCHELLER:  Correct, your Honor.  That deposition

16   happened at the close of fact discovery toward the end of May

17   or early June.  And to the extent the Court would like to

18   review it, I'd be happy to submit it in camera.  It is a

19   medical deposition, so it may not be appropriate for general

20   filing.

21             The other issue that I'd like to raise, and I think

22   that this is an issue that makes this case a little bit

23   difficult to litigate.  And that is that plaintiff's counsel is

24   the architect of their own lawsuit.  They could have added as

25   many class representatives as they saw fit at the -- at the

1   outset of this litigation.

2          But the reality is, Mr. Reyes is not a plaintiff in

3   this case.  He is a plaintiff in another case, of which I am

4   not counsel of record.  I don't know the facts.  I have no idea

5   what happened in that case, which accommodations have been

6   requested, granted, denied or otherwise.

7          And so we are a little late in the game at the close

8   of fact discovery to talk about another potential plaintiff in

9   this case, when the plaintiffs represent both of these

10  individuals and they have from the inception of both pieces of

11  litigation.  And it's -- it's difficult as it -- as a defense

12  attorney to understand really where the ball is.

13         If plaintiffs wanted to add a class representative or

14  potential class representative who is deaf as opposed to

15  hearing impaired, they had the opportunity to do that and

16  elected not to do so.  It's difficult at this point to fathom

17  how we could factor in this other case in this litigation when

18  we've concluded discovery.

19         So I would suggest that it's not really appropriate to

20  relate the cases or add plaintiffs at this point.  And I would

21  just reiterate that I don't really believe that Mr. Hacker is

22  an adequate representative of the class, or that his disability

23  more importantly has not been accommodated.

24         THE COURT:  Well, as I read the general order, the

25  jail has to make reasonable efforts to accommodate Mr. Hacker's

1   preference, right, with regard to addressing his hearing

2   impairment?  And are you saying that his preference -- from

3   what I gather, Mr. Hacker's preference is an -- is to receive

4   an ALD.

5          MS. SCHELLER:  Well, there are two responses to that.

6   I can only answer for the medical staff.  I'll defer to the

7   sheriff's counsel for the jail operations.

8          First, his preference when dealing with medical staff

9   is that he points to one of his ears, and they speak loudly

10  into it.  And that is confirmed by all of the testimony in the

11  record, and it's not controverted in any way, shape or form.

12         The secondary piece is, he could claim a preference of

13  an ALD.  But if it provides zero benefit, as is the testimony

14  from the subject matter expert Dr. Caughlin, then how is he

15  being denied an accommodation?

16         So that would be the secondary argument to that.  And

17  I will defer to the sheriff's counsel as to the remainder.

18         MS. SANCHEZ:  Your Honor, I think after the reasons

19  provided by plaintiff's counsel, we can see clearly that the

20  commonality relied upon by the plaintiff is really the

21  violation, alleged violation, of the general orders without

22  the -- distinguishing any individual needs.  And I think we

23  have done briefs in this case.  I think the law is clear.

24  Commonality is based on the objective standard, not based on

25  subjective standard.

1    We talk about individual preference.  It's really --

2    it's -- it can be easily manipulated for purposes of

3    litigation.  And in example of Mr. Hacker, we -- we didn't know

4    that ALD didn't help him at all.  And -- but after the

5    deposition of his treating physician, we now know that his

6    alleged preferred method actually indeed doesn't help at all.

7    We don't want to get into the motive why he request

8    that.  But that's a prime example of how a plaintiff can claim

9    subjectively he's helped by this method to advance litigation.

10   And I think we are clear that violation of the

11   provision itself is not a common harm or common injury.  Still

12   there has to be common injury sustained by the members of the

13   putative members.  In this case, we heard plaintiff mention

14   Mr. Hacker, Mr. Reyes.  But that's it.  That's it.  We don't

15   have --

16   THE COURT:  But, counsel, if someone -- when someone

17   is admitted into the jail, it's the facility that designates

18   that person either deaf or hearing impaired.  And so by then

19   the facility knows that this person is going to need some sort

20   of assistance in order to hear as compared to -- and to take

21   advantage of all the services that are provided by the prison,

22   or by the jail.  And if the jail isn't abiding by its general

23   order, why isn't that enough?

24   MS. SANCHEZ:  Your Honor, the general order that we

25   talk about says, as needed.  And so what is as needed?

1    THE COURT: Right. But the jail has determined that

2    it's needed by designating them as either deaf or hearing

3    impaired, right? And so there is a need. And what plaintiff's

4    theory is that there may be various degrees of need, but that

5    their theory in the case is that none of the needs are being

6    met, not even the most elementary need.

7        And so if -- and of course, that is their theory. And

8    I recognize that defendants likely disagree with that theory.

9    But if that's their theory of the case and that's their claim,

10   why isn't it enough that someone is designated hard of hearing,

11   hearing impaired, or deaf, and that the jail -- the allegation

12   is the jail just isn't abiding by its general orders?

13       MS. SANCHEZ: Your Honor, as needed has an individual

14   -- individualized element to it. For example, Mr. Hacker. His

15   need is different from another -- from a deaf person or from

16   another hearing impaired person maybe who -- the person who can

17   hear a little bit.

18       So in -- I can envision a lot of situations where a

19   detainee might not need ALD. Or I think we have testimony from

20   the ADA coordinator that not every detainee would prefer a TTY

21   because some people don't like to type. They will use the

22   telephone to make calls.

23       So -- and also we don't know -- when the detainee gets

24   into the jail, we don't know what services or programs they

25   want to participate in. It's really hard to implement or to

1   foresee.  It will put substantial burden on the jail to foresee

2   every inmate comes into the system what programs they are going

3   to taking -- take part in, and to envision or to anticipate the

4   accommodation.  As opposed to if you sign up for a program and

5   you request a sign interpreter, or you do so, and you submit a

6   request, but your request is rejected, that might be a

7   different scenario.

8           However, that's not the class they -- they are trying

9   to certify here.  It's a blanket class based on the alert when

10  they -- when they get into jail.

11          However, we don't know what accommodation is needed

12  for what program and services.  There might be different needs

13  for different programs and services.  There might -- there

14  might be different levels of accommodation even allowed to

15  accommodate that considering the location, safety to other

16  individuals around.  We don't know that yet.

17          It's -- it's -- without the inmate first show the need

18  for the accommodation and the denial of such, I don't think

19  there is violation of the general order.  And certainly not

20  enough for class certification, because we don't have a

21  subject -- we don't have an objective criteria to determine the

22  class members.

23          What we can see is, if your Honor allows this, there

24  will be a lot of manufactured needs because it's subjective.

25  It's -- if we allow any deaf or hearing impaired detainee to be

1    class member without the actual needs or failure to

2    accommodate, then a detainee could just join the class and say,

3    hey, now all of a sudden I have a need. I couldn't hear. Or I

4    cannot sign or I cannot write. I am denied TTY use, even

5    though he has never ever used TTY before. He has always used

6    dayroom telephone.

7              It's -- it's impractical. It's a substantial burden.

8    And it's certainly not the test for class certification. The

9    test again is not a subjective test. It's an objective test.

10   What is the criteria here to identify the members? Is that too

11   broad a class that the plaintiff is trying to certify here?

12             MS. SCHELLER: Your Honor, if I may add briefly just

13   one thing. The Court mentioned that plaintiffs have an

14   allegation that a whole host of these menus of services are not

15   being provided either by medical staff or the jail.

16             But I think that brings us back to who has the burden

17   and when. And a class certification, when plaintiffs filed

18   their class certification brief, presumptively under the rules

19   they would have provided the Court with adequate evidence that

20   their theory was borne out by the facts. And I don't believe

21   that that is true here. And I would submit to the Court that

22   it is not the burden of the defendants to refute an allegation.

23   It would be the burden of defendants to refute evidence if

24   presented.

25             And I think there has been a failing in that regard by

1    the plaintiffs.

2           THE COURT:  So it seems to me, the problem with not

3    knowing what services an inmate would want to sign up for after

4    they entered the jail is a little overblown because it's hard

5    for me to imagine -- assume that the class is limited to people

6    who are designated as deaf or hearing impaired who need some

7    sort of assistance but aren't provided any.  Okay?

8           It's hard to imagine services or programs provided by

9    the jail that wouldn't require some level of hearing, right?

10   And so it's not like -- I can imagine other programs or other

11   disabilities where that might be true.  But here you are

12   talking about just hearing basic instructions and figuring out

13   what the class is about and talking to the counselors or the

14   instructors or the priests or whoever it may be, talking to the

15   guards.

16          And so if the class is designated as people who

17   haven't received any assistance, right, then it seems that

18   those kind of variances of degree, as I stated previously,

19   wouldn't necessarily defeat the class.  Now, the way the class

20   is defined seems to -- seems to be broader than the class that

21   I just suggested.

22          Mr. Morrissey?

23          MR. T. MORRISSEY:  Yes.

24          THE COURT:  You say that your claim is that members of

25   the class haven't received any assistance pursuant to the

1   general order.  Is that --

2           MR. T. MORRISSEY:  They haven't received any auxiliary

3   aids to communicate or to participate in the programs.

4           MS. SANCHEZ:  Your Honor --

5           THE COURT:  Hold on for a second.

6           MR. T. MORRISSEY:  If I could address some of the

7   issues that they --

8           THE COURT:  No, they are not done yet.  I just asked

9   you to address that one issue.

10          MR. T. MORRISSEY:  Sure.

11          THE COURT:  So your class would be those people

12  classified as either deaf or hearing impaired and who need

13  assistance, hearing assistance, including interpreters or other

14  auxiliary aids or services to communicate effectively under

15  access programs, services available to individuals incarcerated

16  by the sheriff, but who were not provided that assistance.

17          MR. T. MORRISSEY:  That would be fine.

18          THE COURT:  Okay.  All right.  Thank you.

19          MS. SCHELLER:  Your Honor, just in response to that,

20  looking at the record in this case, or even listening to

21  plaintiff's argument in the Reyes case, I don't know that any

22  class member, much less class members numerous enough to

23  warrant certification, have been identified.  Persons who have

24  received zero assistance of any kind.

25          Plaintiff's counsel argued that Mr. Reyes wanted

1  greater TTY access and is receiving greater TTY access.  And

2  the evidence in this case is that Mr. Hacker both has used an

3  assistive listening device with his counsel, and he has used it

4  at other times.  I believe Mr. Patrick Morrissey argued in his

5  opening argument that he has been around Mr. Hacker when using

6  an assistive listening device.

7         So if we are going with a class definition where we're

8  talking about hearing impaired persons or deaf persons who have

9  not received any accommodations or assistance under the general

10  order, I don't believe that a singular class member has been

11  identified, much less enough to warrant a class certification.

12         MS. SANCHEZ:  And, your Honor, and Mr. Hacker also

13  attended a WestCare program.  He received assistant listening

14  device at that program, at that -- it was established.

15         THE COURT:  So is it defendants' position that you are

16  complying with the general order?

17         MS. SANCHEZ:  Your Honor, as needed.  If you attend a

18  program and you request so, if you need assistant listening

19  device, and you make that accommodation request, I think the

20  ADA coordinator -- she testified that she will consider that.

21  And, however, Mr. Hacker's case it's now known, except

22  litigation and Mr. Hacker's attorney made the request for ALD

23  device for meetings with attorney.

24         I think we went through with the briefing on the legal

25  issues as -- as to whether that's a program, services provided

1    by jail.  However, when Mr. Hacker attended WestCare, and we

2    presented evidence to the ADA coordinator, coordinator reach

3    out to other personnel at jail and the judge's chamber to get

4    the device to Mr. Hacker.  So his need was accommodated for

5    WestCare.

6              MS. SCHELLER:  Your Honor, on behalf of the medical

7    staff, the general order, of course, applies to the sheriff.

8    It is our position and we will argue that his hearing

9    impairment has been accommodated and accommodated in the manner

10   of his preference.  It would make no sense to make available to

11   him ASL video interpreting, which is available if needed,

12   because Mr. Hacker does not communicate via ASL.

13             So if his preference is to have someone speak into his

14   ear, that's what the medical staff have carried out.  And we do

15   believe that it is a potential basis for summary judgment.

16             So in the long answer, yes, we do believe we complied.

17   And, no, Cook County is not the same as the sheriff's staff

18   with regard to general order.

19             THE COURT:  Okay.  Thank you.

20             MS. SCHELLER:  Thank you.

21             THE COURT:  So, Mr. Morrissey, as you can tell, I am

22   struggling with the definition, the class definition, that you

23   provided in your original motion.  Basically the gist of your

24   suit is that we have people that defendants have designated as

25   deaf or hearing impaired, and they are supposed to follow this

1    general order, and they are just not following it with regard

2    to the class.  That's basically your case.

3            MR. T. MORRISSEY:  And the general order tracks the --

4            THE COURT:  All right.  And so --

5            MR. T. MORRISSEY:  -- ADA regulations.

6            THE COURT:  And so by not following the general order,

7    they are violating the ADA.

8            MR. T. MORRISSEY:  Correct.

9            THE COURT:  Okay.  And just so because Mr. Hacker was

10   provided an assisted listening device for one program doesn't

11   necessarily mean that they are complying with the order because

12   the order requires them to do it whenever he is participating

13   in any program.

14           MR. T. MORRISSEY:  Correct.  But the time that he was

15   provided the ALD was for a previous incarceration.  And when he

16   came in in May of 2017, he filed a grievance.  And he says,

17   since my arrival at the CCDOC, I have not been provided with an

18   available hearing device to account for my disability under the

19   ADA.

20           And the response, consistent with we believe the

21   policy is, by Ms. Rivera:  The ADA does not require us to

22   provide you with a personal use device.  And we maintain that

23   under the ADA that they have to furnish it.

24           Just to digress for a few moments, Mr. Hacker was

25   deposed using an ALD for about five hours.  He was able to

1   respond to the state's attorney's questions.

2          When he went and was seen at -- by the ENTs at

3   Stroger, the doctors there referred him for a hearing aid.  The

4   person that Ms. Scheller is referring to is a attending doctor

5   that never treated Mr. Hacker.  So he has no personal knowledge

6   of Mr. Hacker's hearing deficiency.

7          You are correct.  We want to address those individuals

8   that are classified and diagnosed by medical providers at the

9   jail that on request that they be provided with the auxiliary

10  aid of their choice.  And I think it's significant, your Honor,

11  that the ADA director, pursuant to the sheriff's general order

12  and policies, gets notified right when a person is classified

13  by the medical staff that the person is hearing impaired or

14  deaf.  And I believe that she then has the ability to reach out

15  to those people, find out what their auxiliary aid they may

16  need, and coordinate that service when -- when there are

17  specific programs and services that the person needs an

18  auxiliary aid for.

19         So I don't think it's that complex an issue.

20         THE COURT:  Okay.  So with regard to the Hacker case,

21  Mr. Morrissey, it's apparent that there was a lot of discovery

22  that was done after the initial motion was filed and as the

23  briefing was being conducted.  And I have -- I think I would

24  benefit a lot from an exposition of what was discovered during

25  discovery with regard to how these people not only were -- how

1   these people were designated, but also how they were treated.

2   Okay?  And you seem to have more details about kind of what has

3   been going on.

4           I have also given you my concerns with regard to the

5   breadth and some of the language of the class that you are

6   proposing in this case.  I think that if what you are alleging

7   is basically -- if the case comes down to the class consists of

8   people who need assistance hearing -- and it doesn't really

9   matter whether they are deaf or hearing impaired.  You know,

10  they both, both classes, need assistance hearing.  And that

11  they are just not being provided that assistance as required by

12  the general order, right?

13          And by not complying with the general order, that that

14  means that the defendants aren't complying with the ADA, I can

15  see how a class like that could be certified given -- but what

16  I am concerned about is that the case not have to go, at least

17  for liability purposes, into the various gradations of the need

18  or of the remedy that can be provided, because I think that

19  does -- if defendants aptly argue, that does go into issues

20  about typicality and commonality.

21          Yes, go ahead.

22          MR. T. MORRISSEY:  I don't agree as far as the (b)(3).

23          THE COURT:  But certainly with regard to the (b)(2).

24          MR. T. MORRISSEY:  The (b)(2) it's not necessary to go

25  into individual factors, nor do I believe that for a (b)(3) in

1    regards to a -- if the Court did find -- I mean, we're not

2    talking about a merits determination at this point, whether or

3    not their -- their actions are illegal or not complying with

4    the ADA.  All we're saying is, there is this common claim that

5    they are not furnishing these services.

6          So whether or not defense counsel is correct that they

7    provide it routinely, which I don't think so, that's something

8    that can be decided on summary judgment.

9          In regards to the (b)(3), this is a scenario that's so

10   common with jail policies, litigation.  There are going to be

11   nuances.  Some folks arguably will not be injured, whereas

12   other people will be injured.  There might be causation for

13   some folks; no causation for others.

14         The Seventh Circuit has dealt with that in the Pella

15   versus Saltzman case, which we cited in our brief.  The Court

16   cited it in the Parish decertification ruling.  And so issues

17   of proximate cause and damages can be addressed separately.

18         And that's been the case in numerous cases that I've

19   litigated before various judges, the Jackson case, the Smentek

20   case.  The Zaborowski, a number of these jailhouse cases, your

21   Honor.  Those issues -- and just like the Arreola case that the

22   Seventh Circuit dealt with ten or 15 years ago with canes and

23   crutches, those are issues that can be best addressed

24   separately from liability.

25         THE COURT:  All right.  I don't know if I agree with

1    that.  But what I'd like -- but here is how I'd like to

2    proceed.  Given the concerns that I have raised and the

3    additional facts that are in the record, Mr. Morrissey, I would

4    like plaintiff to submit a renewed motion for class

5    certification.  Okay?  And so I am going to deny the prior one

6    without prejudice.  And I am going to have you submit a renewed

7    one that kind of deals with these issues as well as kind of

8    provides me a greater factual record.  And then I will take

9    another look at it.

10          So when can you -- how much time do you need to get

11   that together?  I see, Mr. Morrissey Junior, he is looking at

12   you.  So --

13          MR. T. MORRISSEY:  I think 14 days.

14          I must say, your Honor, most of the things that we --

15   we'll fine-tune it a bit.  But we don't have the names of the

16   deaf and hard of hearing people that are currently incarcerated

17   and the different nuances.  But we can fine-tune our motion,

18   fine-tune the class definition to address the Court's concern

19   about (b)(2), and --

20          THE COURT:  I think --

21          MR. T. MORRISSEY:  Some will be a rehash.

22          THE COURT:  No, I understand.

23          I think you also need to -- it will be helpful for you

24   to clearly state kind of what your claim is and how you intend

25   to prove it, and then what the remedy is that you are seeking.

1   Okay?  I think that would all be helpful.  And as I said, I am

2   interested to see kind of what was uncovered during discovery

3   with regard to these issues.

4          So, Mr. Morrissey, I will be more charitable than

5   Morrissey Senior, and I will give you 21 days for that.  Okay?

6          And how much time do defendants need to respond?

7          MS. SANCHEZ:  Twenty-eight days, your Honor.

8          THE COURT:  Twenty-eight?  Okay.  That's fine.  That

9   would bring us to August 23.

10         And is 14 days sufficient for reply?

11         MR. P. MORRISSEY:  That's fine.

12         THE COURT:  Fourteen days for reply, September 6.  All

13  right.

14         So now let's turn to Polletta.  So here is --

15  Polletta, I think, Mr. Morrissey, for plaintiffs is a much

16  harder case, right?  And it starts with the question of what is

17  it -- so you have a class, and they all have various

18  accommodations already with regard to their ability to walk and

19  move around.

20         And so the question is, what practically speaking are

21  you asking for with regard to the Leighton court ramp?

22         MR. T. MORRISSEY:  Very simply, your Honor.  Basically

23  the same relief that Judge Gettleman granted, the same relief

24  that the first assistant executive director said they could do.

25  Director Johnsen said, they have a chair at the base of the

1   ramp.  They could easily push somebody up and down.

2            If the person said, just like in the Lacy case, I can

3   wheel myself up and down the ramp on my own, fine.  But barring

4   that, they ought to push -- they ought to provide a wheelchair

5   and assist them up and down the ramp.  The reason being,

6   everybody acknowledges that the ramp doesn't comply with the

7   ADA.  That's a common -- common issue.

8            Second issue, do they have to provide an

9   accommodation?  They say no.  We say obviously that they have

10  to provide an accommodation.  And otherwise, just like Mr.

11  Polletta, they experience pain.  We have a year and a half of

12  people literally clinging to the wall to go up and down the

13  ramp.

14           THE COURT:  But you must also have people that use

15  canes that can go up the ramp pretty readily.

16           MR. T. MORRISSEY:  That's correct.

17           THE COURT:  Right?

18           And they would be part of the class too.  Why should

19  they be part of the class -- or people with crutches, so let's

20  say temporarily for crutches, that they can go up, down the

21  ramp readily without any pain, without any -- you know, without

22  any hinderance.

23           Why should they be part of this class?

24           MR. T. MORRISSEY:  Because alluding to the Lacy

25  decision, Judge Gettleman, there was no question that some

1    people in wheelchairs -- even more clearly, person in

2    wheelchair probably won't fall.  It might be a little

3    stressful.  Might be -- take a lot of energy to wheel up and

4    down.  But the likelihood that they are going to injure

5    themselves is remote.

6           THE COURT:  But --

7           MR. T. MORRISSEY:  Judge Gettleman --

8           THE COURT:  Mr. Morrissey, in Lacy, though, everyone

9    there, the class comprised of people in wheelchairs, right?  So

10    everyone -- so there is that cohesiveness to the class.  They

11    basically can't walk at all.  And so they're in wheelchairs.

12           And whether or not they can kind of go up the ramp or

13    not and the ramp is not ADA compliant, I think everyone admits

14    that.  And so when it comes to -- so the differences between

15    class members in that class seems to be much -- for the

16    purposes of using the ramp, seems to be much less of a degree

17    than the differences amongst the class that you are proposing,

18    which consists of people that have canes or walkers or

19    crutches, even crutches temporarily.

20           And so that's what really kind of gives me pause is

21    that the class that you are requesting seems so overly broad

22    and would include all these types of people with different

23    abilities, with different, you know, impairments or levels of

24    impairments.

25           And so is there enough cohesion in the class that you

1   are seeking?

2          MR. T. MORRISSEY:  There is.  The cohesion is, they've

3   had a diagnosis by a medical person on intake at the jail, or

4   during the course of their incarceration, that they have a

5   mobility limitation.  Without that, your Honor, nobody is

6   prescribed a cane, crutch or walker.

7          Now that it's determined, your Honor, that they need

8   to have these devices in order to ambulate.  And otherwise, you

9   know, obviously the ADA covers people that are -- use walkers,

10  canes and crutches.  And what the Court is really looking at --

11  and it's the same discussion we just had, under a (b)(3)

12  scenario, some may not -- some may fail because they weren't

13  injured, correct?

14         But in a case of a (b)(2), it's a common general

15  question.  The common general question is, does the sheriff

16  have to provide an accommodation?

17         At this stage, from the record in this case, it's

18  clear that nobody has received an accommodation.  We provided

19  the transcript of Director Johnsen.  He stated in his

20  deposition that he's not aware -- and he was in charge of that

21  ramp in his prior position.  He's not aware of anybody that's

22  been assisted up and down the ramp.

23         THE COURT:  But what percentage of the people in your

24  class require or need the accommodation to go up and down that

25  ramp, right?  And so I understand the Pella case.  There is

1    also -- so the Pella case is where Judge Posner said that any

2    class will undoubtedly have people who haven't been injured,

3    right?

4           But he also wrote -- and I have to get this case.  He

5    also wrote in another case, I don't think it's Mullins, but he

6    wrote in another case, this is the same Judge Posner, that a

7    class cannot have a substantial amount of people who have no

8    injury, right?  So somewhere between -- you have to be

9    somewhere in between some but not substantially amount.

10          And so the -- so I as a District Judge kind of read

11    those cases.  And I say, okay, well, how am I supposed to apply

12    these?  And it seems to me that if there are a substantial

13    amount of people that use canes or walkers or crutches that

14    don't require assistance, then this class just simply isn't

15    certifiable.

16          MR. T. MORRISSEY:  Well, you are looking at obviously

17    the Jamie versus Milwaukee case.

18          THE COURT:  It's not --

19          MR. T. MORRISSEY:  There wasn't a diagnosis.

20          THE COURT:  It's not Jamie because Judge Sykes wrote

21    that one.  I'll come up with the name at some point.

22          MR. T. MORRISSEY:  It can probably be addressed by

23    definition.  When we were on appeal in front of the Seventh

24    Circuit on the Lacy case, which hasn't come down yet, one of

25    the judges said, is a person supposed to hope that some

1    benevolent guard will push you up and down the ramp?

2          And that's the same thing we are facing here.  This

3    could be cured with a definition.  Somebody that -- there is a

4    confrontational barrier.  They have a right to benefit from the

5    ability to go to court in the same way as a person that has no

6    mobility impairment.  They have this barrier that causes, I

7    would say, majority of the people, because they've been

8    determined to have a mobility disability, to scale that ramp in

9    order to preserve their constitutional right to go to a

10   criminal hearing.

11         Does each person that requires assistance have to file

12   their own lawsuit when this can be addressed under (b)(2) in a

13   ruling, whether favorable or unfavorable, that the jail does or

14   does not have to accommodate people that are on walkers,

15   crutches or canes?  I don't think so.  And I think that it can

16   be easily addressed under (b)(2).

17         The issue of (b)(3) obviously would depend upon

18   causation and damages.  Some people will have none.  But I

19   think really the sheriff -- and I think you have to look at the

20   feasibility of the remedy here and -- and the rationale of the

21   sheriff in not providing the same relief to a person on a

22   walker as they do for a person on a wheelchair.

23         The reason why Johnsen said, we don't do it, is

24   because the Judge hasn't told us we have to do it.  So unless a

25   Court tells them they have to -- they have to provide an

1    accommodation, the sheriff is very content with allowing on a

2    daily basis -- and we're talking about hundreds and hundreds of

3    people scaling that ramp, which I suggest causes pain and

4    suffering and potential of injury to a majority of the people.

5         And I don't know -- you know, I understand you're

6    saying there are some people that perhaps are fakers --

7         THE COURT:  No, no.  I am not saying that at all.  I

8    am saying -- I'm not saying that there are some people that are

9    fakers.

10         What I'm saying is that there are undoubtedly people

11    who require canes to ambulate through the jail but who could

12    make their way up the ramp without assistance, that don't need

13    assistance to get up the ramp.  You know, and there are

14    probably people with crutches, because just because you have a

15    crutch, you need a crutch to walk around, doesn't mean that you

16    need anything more than a crutch to go up a ramp.

17         And so what I am -- whereas if you are -- so that's

18    what I am saying.  I am not saying that they are fakers at all.

19    I am saying that your class definition is anyone who has been

20    prescribed to use a crutch, walker or cane to attend court.

21    And what I am saying is that it seems to me that there are a

22    lot of people within that class that might not need any

23    assistance to do that.

24         And isn't it plaintiff's burden to show me that there

25    is a class of people that -- you know, that is a cohesive class

1    that would meet the requirements of Rule 23?

2              MR. T. MORRISSEY:  Well, I mean, if we defined it to

3    include just people that needed assistance.  And as far as

4    evidence, we have provided the Court with some videotapes of

5    people going up and down the ramps.  We should have them from

6    last April of 2017 to the present.

7              As far as a (b)(2), I don't think it's an issue.

8    (b)(3) is something that can be dealt with separately.  If we

9    see -- you know, if the Court was to rule on summary judgment

10   under (b)(3) that they violated providing an accommodation for

11   those that need it, and we saw on the video that Joe Jones was

12   running up the ramp with a cane, well, I mean, we could deal

13   with that at that time.

14             But as far as a (b)(2), there is a common question.

15   Common question is whether or not they have to provide an

16   accommodation, accommodation to those folks that request or

17   need an accommodation to go up and down the ramp.  Perhaps we

18   could redefine it to say that because --

19             THE COURT:  I think you have to -- I think at a

20   minimum you have to redefine it to say, it's those people that,

21   you know, are prescribed those various aids who need assistance

22   to traverse the ramp, or to go up and down the ramp.

23             Even under (b)(2) I think you need to do that because

24   you are also looking at typicality problems.  And if you

25   have -- even for commonality.  If you have a bunch of people in

1   that putative class who don't need that assistance, then one

2   wonders whether you even satisfy commonality.

3   MR. T. MORRISSEY:  Well, in that case I think -- well,

4   I think clearly that Mr. Polletta is a -- his claim is typical

5   of the people that need assistance.  He had a fractured,

6   shattered ankle.  And he was initially in a walker -- in a

7   wheelchair.  And then he transitioned to a walker, and then

8   finally to a cane.

9   But his claim is that he needed assistance because of

10  the shattered, and that going down the ramp was excruciatingly

11  painful for him because of the shattered ankle.

12  So I think that he's certainly adequate, and his claim

13  is typical of people that need assistance.  And that can be

14  addressed in one ruling.  Whether or not they have -- for those

15  that need assistance, whether or not the sheriff does or does

16  not have to accommodate them.  And I would -- you know, and

17  depending upon that ruling, we can then deal with the issue of

18  damage.

19  But I think -- I think the definition can be refined,

20  your Honor.  I understand what the Court is addressing.  Judge

21  Gettleman felt otherwise about the definition, because there

22  the definition was all people that are in wheelchairs that go

23  to court, not just Leighton but throughout the court system.

24  And he addressed both in his preliminary injunction hearing and

25  in his class certification issues of whether or not certain

1    putative class reps actually had any problem using a toilet or

2    going up and down.  Because the defense argued very strongly in

3    Lacy that these folks really had no problem going up and down

4    the ramp.

5            But it's a broader issue.  It's much broader than an

6    individual.  It involves the overall general policy that we

7    don't have to provide an accommodation.  And I think that Mr.

8    Polletta is both typical and adequate to represent those folks.

9    And it can be dealt with, I think.

10           THE COURT:  Thank you, Mr. Morrissey.

11           MS. SANCHEZ:  Your Honor, I think I agree with your

12   Honor that the class definition at this time is overly broad.

13   And the common -- I think the plaintiff -- we use the term

14   accommodation very loosely during this oral argument.  But I

15   think the plaintiff made it very clear, the accommodation they

16   are seeking for the class is wheelchair.  And -- but that's not

17   part of their definition.

18           And so just we have the record clear, the deposition

19   transcript of Chief Johnsen in the Hacker case was not part of

20   the brief for the class certification.  It was later filed

21   during the motion for reconsideration.  And I think plaintiff's

22   counsel misstates the testimony given by Johnsen.

23           Johnsen's testimony is more in line with your Honor's

24   reasoning; that is, yes, we have a wheelchair there.  And

25   the -- it's there, but the inmate has to request it because we

1    don't -- not everybody would need it.

2          And the -- your Honor's question on how many, the

3    percentage of inmates with crutches or walker or cane actually

4    is material to this determination because we -- the class

5    certification requires common facts and common law, or common

6    issues, to be predominating over individual needs and the facts

7    surrounding the individuals' disability.

8          And in terms of the -- I think the percentage actually

9    goes to the issue as to the predominance.  And let's say if

10   there is only a few detainees that will actually require a

11   wheelchair to go up and down, do we have a class case?  Or can

12   it be resolved through individual litigation?  Would it make

13   more sense?  And --

14         THE COURT:  Usually, though, those situations like

15   that, like here, I think present definitional problems with the

16   class.

17         MS. SANCHEZ:  Yes, it could be defined, but now the

18   classification -- or the definition is overly broad and doesn't

19   address the individual medical conditions and the duration and

20   the mobility issue.  And it's -- it's improper at this stage to

21   give the classification.

22         MS. SCHELLER:  Your Honor, if I may add the medical

23   perspective to that.  Plaintiff's counsel argued that the ADA

24   certainly applies to persons with canes, crutches and walkers.

25   And while that can be true, it is not necessarily true.

1          I mean, the law under the ADA is that it is meant to

2   apply to persons with real disabilities, not to every

3   individual so as to cheapen the ADA.

4          For example, if I were to hurt myself playing

5   basketball, my ankle, I may for a finite period of time require

6   an ambulatory aid.  That does not mean I would qualify to

7   recover under the ADA if there was some type of violation

8   within the jail.  So I'd like to just start from that point.

9          Now, with regard to Mr. Polletta, whether or not his

10  injury qualifies as a disability is not really the argument

11  that we are having today.  But I would just like to point out

12  that I think that plaintiff's assertion of the rights under the

13  ADA was a bit more broad than is actually covered.

14         The next piece I would like to point out is that these

15  ambulatory aids that are giving rise to plaintiff's proposed

16  class definition are accommodations under the ADA.  That's what

17  they are.  And to the extent that those ambulatory devices are

18  insufficient for any individual detainee, it is incumbent then

19  upon the detainee to request an additional accommodation.  It

20  is not the place for medical providers or for anyone else to

21  impose accommodations upon persons with disabilities.  And I

22  think --

23         THE COURT:  But isn't that what they are doing?  They

24  are saying, so if you -- if I am someone who uses a walker, is

25  prescribed to use a walker, and I have a hearing at Leighton,

1    and I go there and I look at that ramp.  And, you know, I just

2    think that I think I need some assistance.

3             And so shouldn't there be some of way right then and

4    there that I can ask for assistance and the assistance be given

5    to me?

6             MS. SCHELLER:  I believe that that is accurate, your

7    Honor.  I don't believe that plaintiffs can prove that that is

8    not happening.  And I also don't believe that they can prove it

9    on a scale so numerous as to warrant class certification, or an

10   experience so common as to warrant class certification.

11            So the first premise is correct.  I don't believe that

12   plaintiffs have met their burden of showing any of these

13   things.  Certainly there are many people who use the ramp with

14   ambulatory aids that are unassisted.  Whether all of them would

15   like assistance has not been proven.  Whether any of them would

16   like assistance is not in the record, outside of Mr. Polletta.

17            So, you know, I think that we find ourselves once

18   again in the position where plaintiffs are supplementing briefs

19   after things are done and, you know, talking about additional

20   people, additional clients.

21            But the strictures of Rule 23 are pretty clear.  When

22   a plaintiff filed for motion for class certification, they are

23   signaling to the Court and to everyone else, they have all the

24   discovery that is needed, and they are prepared to ask for

25   certification of the class.

1      And when we have back end of things coming from all

2  sides, it's really quite prejudicial and unfair.  So I would

3  just point that out.

4      And then the final point that I wanted to join Ms.

5  Sanchez in making is that we haven't heard of numerous common

6  fact patterns of persons, identifiable persons, potential class

7  members, who are using these ambulatory aids, requesting

8  assistance up the ramp and being denied.  We just have not been

9  provided with any number of persons.  We haven't been provided

10  with their identities.

11      THE COURT:  But aren't there videos of people that

12  clearly are having some difficulty navigating that ramp?

13      MS. SCHELLER:  Yes, your Honor.  And I'll provide a

14  counter example to that.  My grandfather was a double amputee.

15  And he had a golf cart with an attachment on it, and he would

16  buckle himself in.  And he was allowed to drive it up to the

17  tee box.  And he was terrible, and he would fall down from time

18  to time.  He did not want any additional assistance.

19      And I don't think we can look at videos and determine

20  what that person's individual desire was for additional

21  assistance.  If the plaintiffs can procure actual people -- and

22  by procure I mean before they filed the class certification

23  brief months ago -- actual, identifiable person who had

24  ambulatory aids and requested additional assistance, we would

25  be having a different conversation.

1    But I think they have fundamentally failed in their

2    burden.  And we are once again on the back end, you know,

3    trying to fend off all of these sort of ancillary side

4    anecdotes.

5    THE COURT:  Okay.  Thank you.  Mr. --

6    MR. T. MORRISSEY:  May I address that, your Honor?

7    THE COURT:  No need at this time, Mr. Morrissey.

8    Thank you.

9    So, Mr. Morrissey, and I am addressing this to the

10    junior Mr. Morrissey, I am going to add to your work, Mr.

11    Morrissey, because I do think that the class definition as

12    currently stated in the motion is overly broad.  And so I am

13    going to deny the motion for class certification without

14    prejudice.

15    But again on the same -- and I do think defendant has

16    a point that to the extent that there are additional things in

17    the record that would support plaintiff's revised definition,

18    that they are entitled to have it up front.  And I would like

19    to see it all.

20    And so if it's within the realm of practical

21    possibility and your family obligations, Mr. Morrissey, I would

22    like Mr. Polletta to file a renewed motion for class

23    certification along the same schedule.  Is that doable?

24    MR. P. MORRISSEY:  That's fine, your Honor.

25    THE COURT:  Is that doable for defendants?

1      MS. SANCHEZ:  Yes, your Honor.

2      MS. SCHELLER:  Without seeing the motion, I am

3  somewhat reticent to agree to the same schedule.  But I presume

4  the Court would entertain a motion for extension of time if

5  necessary?

6      THE COURT:  Yes, if necessary.

7      So I will go ahead and set the same briefing schedule

8  for a renewed motion for class certification in the Polletta

9  case.  All right?

10      So I want to thank counsel for spending time with me

11  this afternoon and exploring some of these issues.  I think it

12  was very helpful to me actually.  And at this point, unless

13  there is anything else that I can address, I look forward to

14  seeing the briefing on the renewed motions.

15      MS. SCHELLER:  Your Honor, may we bring up one

16  housekeeping matter on Hacker?

17      THE COURT:  Yes.

18      MS. SCHELLER:  At least on behalf of the Cook County

19  defendants, I wonder if the Court would entertain a Rule 56

20  motion in conjunction with this briefing schedule?

21      THE COURT:  I will not at this time.  Okay?  Let's

22  deal with class certification first.

23      Mr. Morrissey, when was Lacy argued?

24      MR. P. MORRISSEY:  April 19.

25      THE COURT:  April 19.  Who is on the panel?

1    MR. P. MORRISSEY:  Judge Ripple, Judge Manion, Judge

2  Kanne.

3    THE COURT:  Okay.  All right.  Very good.  Thank you

4  very much.

5    MR. T. MORRISSEY:  Thank you.  Have a nice weekend,

6  your Honor.  Thanks for the time, too, your Honor.  I think it

7  was helpful.

8    THE COURT:  It was very helpful.  Thank you.

9    (Which were all the proceedings heard in this case.)

10                          CERTIFICATE

11    I HEREBY CERTIFY that the foregoing is a true, correct

12  and complete transcript of the proceedings had at the hearing

13  of the aforementioned cause on the day and date hereof.

14

15   /s/Alexandra Roth                    7/11/2018

16  _____       _____
    Official Court Reporter                    Date
17  U.S. District Court
    Northern District of Illinois
    Eastern Division
18

19

20

21

22

23

24

25