IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| GERALD HACKER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 17 C 4282 |
| | ) | |
| THOMAS DART, Sheriff of Cook | ) | Judge John Z. Lee |
| County, Illinois, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Gerald Hacker, an inmate in the Cook County Department of Corrections ("CCDOC"), seeks to represent two classes of deaf or hearing-impaired detainees in an action against Sheriff Thomas Dart under Title II of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12131 *et seq.*, and Section 504 of the Rehabilitation Act ("RA"), 29 U.S.C. § 794. For the reasons stated herein, Plaintiff's motion is denied.

## Background

Hacker, who has been incarcerated in the CCDOC since February 10, 2017, has "limited ability to hear sound using his right ear and no ability to hear from his left ear." Am. Compl. ¶ 29, ECF No. 27. Upon his arrival in the CCDOC, he was classified as "hearing impaired." *Id.* ¶ 30. Hacker alleges that after his intake, he was unable to engage in a 15-minute telephone call because there was no Telecommunications Device for the Deaf, or "TTY," in the Receiving, Classification, Diagnostic Center ("RCDC"). *Id.* ¶¶ 8, 15, 31.

Furthermore, once Hacker was transferred to the Residential Treatment Unit ("RTU") for housing, he continued to be denied access to programs and services because of his hearing impairment. *Id.* ¶¶ 19, 32. In particular, Hacker does not have an equal ability to communicate

with individuals outside the jail as compared to non-hearing-impaired detainees, because he relies on a TTY, which is provided only upon request and during normal business hours. *Id.* ¶¶ 33–34.[1] Similarly, Hacker cannot use the RTU's video-visitation program because of his impairment. *Id.* ¶ 35. Finally, although Hacker has been approved to use an assistive listening device ("ALD"), the CCDOC has not provided him with access to such a device or to a personal-use hearing aid, preventing him from communicating with staff members and other inmates. *Id.* ¶¶ 39–42. Hacker alleges that this deprivation has caused him to miss announcements about receiving medication and has prevented him from participating in religious services. *Id.* ¶ 42.

According to Hacker, the difficulty that he faces is part of a longstanding problem at the jail with accommodating disabilities. The United States Department of Justice, in May 2012, issued a letter concluding that the jail was in violation of the ADA for failing to provide access to services, programs, and activities for inmates with disabilities. *See* Pl.'s Ex. 1, Implementation Plan at 1, ECF No. 163. Accordingly, Sheriff Dart and Cook County agreed to enter into an "Implementation Plan" to remedy the existing ADA violations. *See id.*

The Implementation Plan required the CCDOC to take steps to establish ADA compliance, including by adopting a "General Order" to address nondiscrimination on the basis of disability. *See id.* at 4. Furthermore, the Implementation Plan explains that the CCDOC has hired an ADA Compliance Officer, whose duty is to coordinate requests for accommodations from detainees. Pl.'s Ex. 1, Implementation Plan at 6. The ADA Compliance Officer is required to maintain records of requests for auxiliary aids and services, as well as records of such services when they are provided. *Id.*

---

[1]  Hacker has since been granted increased TTY access during the course of this litigation. *See* Minute Entry of Sept. 1, 2017, ECF No. 59; Minute Entry of Sept 6, 2017, ECF No. 63; Minute Entry of Sept. 11, 2017, ECF No. 66; Minute Entry of Jan. 26, 2018, ECF No. 132.

2

The Sheriff's Office issued General Order 24.18.8.0, "Nondiscrimination on the Basis of Disability," on July 23, 2014. Pl.'s Ex. 2, General Order, ECF No. 163. The General Order sets forth procedures for identifying inmates with disabilities through intake and other points of contact. *Id.* §§ VIII.A–VIII.B. The General Order also provides guidelines for accommodating inmates with all types of disabilities, *id.* §§ VIII.C–VIII.D, as well as specific guidelines for detainees with speech and hearing impairments, *id.* § VIII.G.

In particular, the General Order requires the following with respect to speech and hearing-impaired inmates:

(1) Auxiliary aids (including, but not limited to, gestures, sign language, captioned images, visual aids, written communication, computers, typewriters, assistive listening devices, TTY, or qualified sign language interpreters) must be "available" on an "as-needed basis, 24 hours a day, seven days a week";

(2) CCDOC members must make "all efforts to communicate effectively" with hearing impaired inmates and seek assistance if they believe an inmate is having "difficulty understanding or communicating";

(3) The ADA Compliance Officer must ensure that each divisional Superintendent housing hearing or speech-impaired subjects has a "current list of certified sign language interpreters/services and their contact information";

(4) CCDOC members must contact qualified language interpreters and/or services for assistance with "critical communication, complex information, lengthy exchanges, or anything involving legal due process," including, but not limited to intake, orientation, counseling, educational and vocational programming, medical and mental health services, religious services, due-process hearings, disciplinary hearings, pre-release instructions, or "[w]hen another service is unavailable or insufficient";

(5) Inmates with impairments must be given the same access to telephone services as other inmates;

(6) Each division housing hearing-impaired subjects must be equipped with a TTY, and "[s]ubjects with speech/hearing impairments or subjects who wish to communicate with persons who have speech/hearing disabilities" must be "afforded access" to such devices, including being given, at a

3

> minimum, three times the length of time permitted for voice communications;
>
> (7) "As needed," the CCDOC must make available "Telecommunications Relay Services (TRS), Illinois Relay System, or Video Relay Service ("VRS") to "connect speech/hearing impaired persons with others";
>
> (8) Living units housing hearing-impaired subjects must institute a visual notification system to "provide effective communication regarding times for meals, recreation, education, work assignments, and other events," and the living unit officer must ensure that this system is used and that hearing-impaired subjects are paying attention;
>
> (9) Fire alarms must utilize a light and sound notification system.

Pl.'s Ex. 2, General Order § VIII.G.

Hacker agrees that the General Order "tracks most of [Defendant's] obligations imposed under the ADA." Pl.'s 2d Mot. Class Cert. at 9, ECF No. 163. But he alleges that Defendant Dart, as policymaker for the CCDOC, does not follow the General Order and thus has "not implemented policies and procedures so inmates with substantial hearing disabilities can communicate as effectively as other inmates." *Id.* at 3.

Accordingly, Hacker seeks to certify two classes for his claims under the ADA and the RA (Count I).[2] First, he requests certification of the following injunctive class under Federal Rule of Civil Procedure ("Rule") 23(b)(2):

> All individuals incarcerated by the Sheriff of Cook County classified as hearing impaired or deaf who require hearing-related accommodations to communicate effectively and/or to access or participate in programs, services, or activities available to individuals in the custody of the Cook County Jail.

---

[2] Hacker's amended complaint also alleges a claim under the Religious Land Use and Institutionalized Persons Act of 2000, 42 U.S.C. § 2000cc *et seq.* (Count II); (2) a claim of deliberate indifference to his need for an ALD, *see* 42 U.S.C. § 1983 (Count III); (3) a claim under the ADA and RA regarding access to the Leighton Criminal Courthouse (Count IV); and (4) a claim of unreasonable force by a tier officer (Count V). *See* Am. Compl. at 10–14. Hacker's request for class certification pertains only to Count I of his amended complaint. That claim is brought against only Sheriff Dart in his official capacity; Plaintiff has voluntarily dismissed the class allegations as to Cook County.

4

Second, he seeks to certify the following class under Rule 23(b)(3):

> All individuals incarcerated by the Sheriff of Cook County from July 25, 2015, to the date of entry of judgment classified as hearing impaired or deaf who require hearing-related accommodations to communicate effectively and/or to access or participate in programs, services, or activities available to individuals in the custody of the Cook County Jail.

Pl.'s 2d Mot. Class Cert. at 1.[3]

Hacker contends that certification of these classes is appropriate because Dart, as the policymaker for the CCDOC, is violating the terms of the Implementation Plan and General Order in a number of ways. First, he contends, the CCDOC's ADA Compliance Officer, Sabrina Rivero-Canchola, does not fulfill her duties under the Implementation Plan and General Order. For example, Hacker claims that, in her initial meeting with potentially disabled inmates, Rivero-Canchola does not explain the accommodations that are available to them. This has been corroborated by Rivero-Canchola to some extent. During her deposition, she testified that, while she meets with detainees during the first week of their admission to the jail and "tell[s] them that we will make accommodations available to them," she does not "specifically list all the accommodations that may be made available to them such as ALDs, interpreters, and gesturing, and writing, and flashcards." Pl.'s Ex. 3, Rivero-Canchola Dep., at 133:17–22, ECF No. 163. What is more, as Hacker points out, Rivero-Canchola acknowledged that she does not keep documentation or other records of her first meeting with a deaf or hearing-impaired inmate. For example, when asked what she does with information given to her by an inmate about an accommodation he or she may need, Rivero-Canchola responded: "I store it in my brain[.]" *Id.* at

---

[3] Hacker first moved for class certification in August 2017. The Court denied that motion in March 2018. Hacker then moved to reconsider, and the Court heard oral arguments on July 5, 2018. The Court denied Hacker's motion without prejudice, but permitted Hacker to file a renewed motion for class certification, which is the motion now before the Court.

5

33:18–22; *see also id.* at 45:5–7 ("I do not keep any documents of my visits with those inmates."). Furthermore, Rivero-Canchola explained that she does not record when auxiliary aids are provided to detainees. *See id.* at 147:13–14, 152:11–13.

Second, Hacker asserts that qualified sign-language interpreters are not available on a 24/7 basis as required by the General Order; nor are they made available for "critical communications," such as disciplinary hearings, intake, orientation, religious services, educational and vocational programming, or conversations with legal counsel. *See* Pl.'s Ex. 2, General Order § VIII.G. Additionally, not all of the jail's divisions even maintain a list of such services, as the General Order requires. These allegations are corroborated in part by Martha Yoksoulian, the Superintendent of the RTU, and Jason Cianciarulo, Superintendent of Division 9, both of whom testified that they do not maintain contact information for qualified sign-language interpreters. Pl.'s Ex. 4, Yoksoulian Dep., at 12:5–12, ECF No. 163; Pl.'s Ex. 6, Cianciarulo Dep., at 9:19–10:12, 10:12–16, ECF No. 163. Yoksoulian further agreed that deaf and hearing-impaired inmates are not provided with interpreters when they participate in group therapy in the RTU. Yoksoulian Dep. at 96:12–14. And even Rivero-Canchola testified that no sign-language interpreters were provided in 2017 or 2018 for intake, religious services, or disciplinary hearings. Rivero-Canchola Dep. at 124:14–125:2, 167:21–168:18, 169:10–23, 170:27–7. The lack of qualified sign-language interpreters has affected some detainees, such as Rene Barbosa, who is deaf and communicates only through sign language or in writing. Barbosa has difficulty communicating with jail staff because "none of them understand sign language or want to write [him] notes." Pl.'s Ex. 13, Combined Declarations, Barbosa Decl. ¶¶ 2, 4, ECF No. 163.

Third, Hacker claims that the CCDOC fails to provide equal access to TTYs and other telephone services. Hacker himself had difficulty accessing a TTY prior to the Court's

6

involvement in that issue; he could not use a TTY unless he submitted a written request. *See* Pl.'s Ex. 7, Def. Dart's Resp. Pl.'s Requests to Admit ¶ 39, ECF No. 163. There was no TTY in the RTU dayroom, so staff would have to coordinate one's use elsewhere. *See id.* ¶¶ 35–38, 41–43. Other inmates, such as Barbosa, Melvin Coleman, and Wilbert Reyes, have also experienced difficulty accessing TTYs. Pl.'s Ex. 13, Combined Declarations, Barbosa Decl. ¶ 3; *id.*, Coleman Decl. ¶ 8; *id.*, Reyes Decl. ¶ 7.[4] But inmates' difficulties are not limited to the use of TTYs, as demonstrated by the experience of Jerome Lawrence, who is hard of hearing in both ears. *Id.*, Lawrence Decl. ¶ 2. He says the jail has "implemented a procedure where [he is] allowed to use the dayroom phone for a limited time when all inmates are locked in their cells." *Id.* ¶ 7. But that time is usually between 1 p.m. and 3 p.m., which is not when his public defender is available to talk to him. *Id.* ¶¶ 7–8. And often, "the correctional officer assigned to [his] tier does not allow [him] to use the telephone during this time period despite a written order posted inside the officer's room allowing [him] to use the telephone during this time." *Id.* ¶ 7. Rivero-Canchola has acknowledged that the CCDOC's system results in some difficulties for hearing-impaired inmates—in an email to another CCDOC staff member, she stated: "Deaf and hard of hearing detainees do not have equal access to phones. Calls have to be scheduled with the social workers who are not on site during the weekend." Pl.'s Ex. 12, ECF No. 163.

Fourth, Hacker points out that other types of accommodations for hearing-impaired detainees—such as computers, typewriters, and visual aids—are not available in either the RTU or Division 9. Yoksoulian and Cianciarulo both confirmed these facts in their depositions. *See* Yoksoulian Dep. at 11:18–12:4; Cianciarulo Dep. at 8:1–10:5.

---

[4] Reyes has since filed his own lawsuit and has obtained an agreed order allowing him access to a TTY, among other accommodations. *See* Pl.'s Ex. 14, Orders Entered in *Reyes v. Dart*, 17 C 9223.

7

Fifth, Hacker complains of the CCDOC's refusal to provide hearing aids for personal use. Hacker himself filed a grievance in May 2017 concerning this issue. Pl.'s Ex. 9, Hacker Grievance, ECF No. 163. Rivero-Canchola responded by stating: "The ADA does not require us to provide you with a personal use device. You were provided with an assistive listening device during your participation in [a] drug treatment program. Captions are available on [TV]. Please advise us of any other accommodations you need at this time." *Id.* Hacker insists, however, that he needs a hearing aid to participate in religious services and the daily activities of the jail, such as hearing announcements to receive medication, food, and clean clothes. But affidavits from other detainees confirm that the CCDOC will not provide new or replacement hearing aids. Ordinarily, the most it will do is replace batteries in hearing aids brought to the jail by detainees, and even that process can take days. *See* Pl.'s Ex. 13, Combined Declarations, Coleman Decl. ¶¶ 5–7, 9–10; *id.*, Lawrence Decl. ¶¶ 4–5; *id.*, Reyes Decl. ¶¶ 2–5; *id.* Shea Decl. ¶¶ 3–4; *id.*, Warren Decl. ¶¶ 2–5, 7–8; *id.*, Morris Decl. ¶¶ 2–3. In one case, however, jail staff sent a hearing aid out for repair, because it was covered by a warranty. *Id.*, Denomie Decl. ¶¶ 3–9.

Sixth, Hacker asserts that the CCDOC does not provide ALDs during programs and services. As to religious services, Rivero-Canchola testified that "other than Mr. Reyes, no detainee has asked for an ALD for church services or religious services," in 2017 or 2018, and therefore, none has been provided for those services. Rivero-Canchola Dep. at 132:6–17. Furthermore, according to Yoksoulian, in the RTU, the staff does not have access to "any type of auxiliary aid" on a 24-hour basis. Yoksoulian Dep. at 93:21–24. And when deaf and hearing-impaired inmates in the RTU attend group therapy sessions, they are not provided with an ALD or amplifier. *Id.* at 96:4–11, 96:21–97:2, 98:15–99:2, 100:4–13.

## **Legal Standard**

"A district court may certify a case for class-action treatment only if it satisfies the four requirements of Federal Rule of Civil Procedure 23(a)—numerosity, commonality, typicality, and adequacy of representation—and one of the conditions of Rule 23(b)." *Jamie S. v. Milwaukee Pub. Sch.*, 668 F.3d 481, 493 (7th Cir. 2012). Under Rule 23(b)(2), a class may be certified for injunctive relief if "the party opposing the class has acted or refused to act on grounds that apply generally to the class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole." Under Rule 23(b)(3), a class may be certified for a damages action if (1) questions common to class members predominate over individual questions, and (2) class resolution is superior to other available methods of adjudication. Additionally, a court may only certify a class that is "ascertainable." *See Jamie S.*, 668 F.3d at 493.

It is well-established that "Rule 23 does not set forth a mere pleading standard." *Parko v. Shell Oil Co.*, 739 F.3d 1083, 1085 (7th Cir. 2014) (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). Rather, "[p]laintiffs bear the burden of showing that a proposed class satisfies the Rule 23 requirements." *Messner v. Northshore Univ. Healthsystem*, 669 F.3d 802, 811 (7th Cir. 2012). As such, when reviewing whether class certification is appropriate, a court "may not simply assume the truth of the matters as asserted by the plaintiff," but instead must receive evidence and resolve factual disputes as necessary to decide whether certification is appropriate. *Id.* (citing *Szabo v. Bridgeport Mach., Inc.*, 249 F.3d 672, 676 (7th Cir. 2001)). "[C]ertification is proper only if the trial court is satisfied, after a rigorous analysis, that the prerequisites" of Rule 23 have been met. *Wal-Mart*, 564 U.S. at 350–51.

## Analysis

Defendant's objections to class certification all reflect a similar theme—a lack of commonality among the class members. He argues that the class members have not suffered a common injury and the class is therefore not ascertainable; that determining whether each detainee is entitled to a reasonable accommodation requires a highly individualized inquiry and therefore implicates no common questions of fact or law; that no one detainee's experience is typical of another's; and that individual questions concerning detainees' needs and abilities will predominate the litigation. Hacker contests these assertions, arguing that the simple question posed by this suit is whether Dart, as policymaker for the CCDOC, has allowed practices to flourish which violate the General Order and the Implementation Plan. Accordingly, the parties' disputes center on the requirements of commonality, typicality, the potential for class-wide injunctive relief for purposes of Rule 23(b)(2), and predominance for purposes of Rule 23(b)(3).

Commonality requires "questions of law or fact common to the class," Fed R. Civ. P. 23(a)(2), although "even a single common question will do," *Wal-Mart*, 564 U.S. at 359 (alterations and quotation marks omitted). "[T]he Supreme Court explained in *Wal-Mart* that superficial common questions—like . . . whether each class member 'suffered a violation of the same provision of law'—are not enough." *Jamie S.*, 668 F.3d at 497 (quoting *Wal-Mart*, 564 U.S. at 350). Rather, putative class plaintiffs' "claims must depend upon a common contention" that is "of such a nature that it is capable of classwide resolution—which means that determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke." *Wal-Mart*, 564 U.S. at 350. Because of this, commonality demands that the class members have "suffered the same injury." *Id.*

Similarly, typicality under Rule 23(a)(3) requires that the named plaintiff's claims "arise[ ] from the same event or practice or course of conduct that gives rise to the claims of other class members" and "are based on the same legal theory." *Keele v. Wexler*, 149 F.3d 589, 595 (7th Cir. 1998). Where problems arise with regard to satisfying either the typicality or commonality requirements, the analyses "tend to merge." *Priddy v. Health Care Serv. Corp.*, 870 F.3d 657, 660 (7th Cir. 2017) (quoting *Gen. Tel. Co. of Sw. v. Falcon*, 457 U.S. 147, 157 n.13 (1982)).

Here, Hacker asserts that the CCDOC has various practices that violate its own rules under the Implementation Plan and General Order, and thereby violate the ADA. Examples include the jail's refusal to supply working hearing aids to inmates, its failure to keep accurate records of qualified sign-language interpreters or to make interpreters available for critical communications, and its failure to provide access to TTYs or otherwise to provide equal access to telephones.

None of Hacker's examples, however, implicate a policy or practice that affects the *entirety* of either proposed class. As Defendant points out, not every deaf or hearing-impaired inmate needs the same accommodations, and not every accommodation is reasonable as to each inmate. For instance, although some hard-of-hearing inmates rely on hearing aids, an inmate with complete deafness may not. And although some inmates with hearing impairments need a TTY to use the telephone, others, like Lawrence, can do so with other accommodations (such as a quiet room). Similarly, as is the case with Shea, not every hearing-impaired inmate understands sign language; therefore, an injunction ordering 24/7 access to sign-language interpreters would not provide class-wide relief. Because the policies challenged by Hacker concern the provision of accommodations—the need for which varies from detainee to detainee—these policies do not present common questions under the ADA or the RA.

Still, Hacker argues that differences between individual plaintiffs in the classes need not preclude commonality or typicality. He relies primarily on two cases, both concerning policies affecting inmates with disabilities. First, he points to *Holmes v. Godinez*, in which deaf and hard-of-hearing inmates in the Illinois Department of Corrections ("IDOC") challenged a variety of written policies and general practices that affected their ability to communicate and access services. 311 F.R.D. 177, 189–209 (N.D. Ill. 2015). There, the court found questions common to the class, explaining that plaintiffs' "allegations regarding IDOC's system-wide failures [were] the 'glue' that tie[d] their claims together." *Id.* at 220. But in *Holmes*, unlike in this case, the plaintiffs challenged a written ADA policy, arguing that it was insufficient to protect their rights. *See id.* at 218–19. Determining the legality of the written policy was a common question that would drive the litigation without reference to the situations of individual inmates. *See id.* Here, Hacker acknowledges that the General Order *complies* with the ADA and the RA; the practices he challenges are not necessarily system-wide but instead are more isolated in application and effect.

Furthermore, to the extent *Holmes* held that policies affecting only some class members can constitute "common" questions, that holding has been limited by the Seventh Circuit's decision in *Lacy v. Cook County, Illinois*—the other decision upon which Hacker relies. Hacker seizes on *Lacy*'s observation that "[a]lthough it is true that the reasonableness of a given accommodation [under the ADA] will vary among individuals with differing disabilities, any dissimilarities among the proposed class members will not impede the generation of common answers[.]" 897 F.3d 847, 865 (7th Cir. 2018). But in *Lacy*, the plaintiffs all had a common physical impairment—they were all wheelchair-bound. *See id.* Furthermore, they faced "common physical barriers when they confront[ed] steep ramps and noncompliant bathroom facilities." *Id.* And the injunctive relief they sought—"assistance in pushing them up and down the ramps and

escorting them to ADA-compliant restrooms"—would address that common injury in one fell swoop. *See id.* In this case, by contrast, plaintiffs "allege[ ] a variety of disabilities or [seek] a variety of accommodations based on their differing abilities." *Id.* Thus, unlike in *Lacy*, this *is* "a situation where 'the defendant's allegedly injurious conduct differs from plaintiff to plaintiff.'" *Id.* at 865–66 (quoting *Suchanek v. Sturm Foods, Inc.*, 764 F.3d 750, 756 (7th Cir. 2014)); *see also Jamie S.*, 668 F.3d at 497–98 (finding commonality requirement not satisfied where each class member alleged suffering from "disparate individual . . . violations.").

The one policy that could be said to present a common question is Rivero-Canchola's failure to explain the accommodations available or to record the accommodations requested by a particular inmate. But Hacker has presented no evidence that any inmate has been specifically harmed by that practice; moreover, he has not explained how that practice could be said to violate the ADA or the RA. Accordingly, this practice alone cannot support a common question of law or fact rendering class-wide resolution appropriate. *See Phillips v. Sheriff of Cook Cty.*, 828 F.3d 541, 556 (7th Cir. 2016) (finding common question insufficient to satisfy Rule 23(a)'s commonality requirement where it did "not advance materially any individual's claim"); *see, e.g.*, *Benavides v. Chi. Title Ins. Co.*, 636 F.3d 699, 702–03 (5th Cir. 2011) (affirming district court's denial of class certification where the only common question capable of class-wide determination was not in dispute); *In re Jackson Nat'l Life Ins. Co. Premium Litig.*, 209 F.R.D. 134, 140–41 (W.D. Mich. June 6, 2002) ("Because resolution of [the common issue] does nothing . . . to advance the litigation, it is not a common question of law or fact sufficient to satisfy the commonality requirement.").

Hacker has failed to establish that any common questions of law or fact exist that are both capable of class-wide resolution and likely to advance the litigation. For the same reasons, he

cannot show that his claims are typical of those of other detainees. Accordingly, Hacker has not met the prerequisites of Rule 23(a).[5] And this "necessarily means that [he] ha[s] not satisfied . . . the more strenuous predominance requirement of Rule 23(b)(3)." *McCaster v. Darden Rests., Inc.*, 845 F.3d 794, 801 (7th Cir. 2017); *see also Spicer v. Chi. Bd. Options Exch., Inc.*, No. 88 C 2139, 1990 WL 16983, at *5 (N.D. Ill. Jan. 31, 1990) ("[A] finding of predominance necessarily includes a finding of commonality.").

Similarly, Hacker cannot show that "a single injunction or declaratory judgment would provide relief to each member of the class" for purposes of Rule 23(b)(2). *Jamie S.*, 668 F.3d at 499. Although Hacker superficially structures his claim around a request to enjoin Dart to comply with the General Order, the General Order itself requires that accommodations be provided to detainees *as needed*. Since Hacker acknowledges that the General Order "tracks" the obligations posed by the ADA, this looks much like an injunction to obey the law, which presents concerns of vagueness and overbreadth. *See Equal Rights Ctr. v. Kohl's Corp.*, No. 14 C 8259, 2017 WL 1652589, at *5 (N.D. Ill. May 2, 2017) (finding plaintiffs' proposed order requiring defendants to comply with the ADA to be an obey-the-law injunction insufficient to satisfy Rule 23(b)(2)) (citing *EEOC v. AutoZone, Inc.*, 707 F.3d 824, 841 (7th Cir. 2013). Such an injunction likely would "initiate a process through which" the CCDOC would have to determine, in a "highly individualized" fashion, what accommodations are needed by each inmate, and which are reasonable. *Jamie S.*, 668 F.3d at 499.

---

[5] Because the Court concludes that commonality and typicality are not met, the Court does not address ascertainability, numerosity, or adequacy of the representation.

## Conclusion

For the reasons stated herein, Hacker's Rule 23 motion for class certification is denied. A status hearing is set for 4/18/19 at 9:15 a.m.

**IT IS SO ORDERED.**  ENTERED    3/18/19

*/s/ John Z. Lee*
_____
**John Z. Lee
United States District Judge**