**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

|  |  |  |
|---|---|---|
| GERALD HACKER, | ) | |
| | ) | |
| Plaintiff, | ) | Case No. 17-cv-4282 |
| | ) | |
| v. | ) | Hon. Steven C. Seeger |
| | ) | |
| THOMAS DART, Sheriff of Cook County, | ) | |
| COOK COUNTY, ILLINOIS, SABRINA | ) | |
| RIVERO-CANCHOLA, and Officer | ) | |
| D. SANDOVAL, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

A hearing-impaired inmate, Gerald Hacker, began his tenth incarceration at the Cook County Jail in February 2017. Before long, his impairment started causing serious issues. He couldn't hear orders from an officer, who then shoved Hacker for not doing what he said. He struggled to communicate with others in the jail, including the medical staff. And he had trouble calling people outside the jail, too.

A few months into his incarceration, Hacker sued Thomas Dart (the Cook County Sheriff), two Sheriff's Office employees, and Cook County. Hacker claimed that Cook County and the Sheriff violated his rights under the Americans with Disabilities Act and the Rehabilitation Act by not accommodating his hearing impairment. He also claimed that Officer Sandoval used unreasonable force in violation of the Fourteenth Amendment by shoving him.

After discovery, Defendants moved for summary judgment. They argue that Hacker did not satisfy the exhaustion requirement under the Prison Litigation Reform Act ("PLRA"), and thus cannot bring a claim for Officer Sandoval's shove. They also argue that Hacker lacks

evidence of any physical injuries, and thus has no claim for compensatory damages under the ADA or the Rehabilitation Act.

For the reasons stated below, Defendants' motion is granted.

## Background

In 2017, Gerald Hacker was incarcerated in the Cook County Jail. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶¶ 9, 24 (Dckt. No. 256). Since 2008, Hacker has spent most of his time in the Illinois Department of Corrections. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 7 (Dckt. No. 257). He has resided at the Cook County Jail at least ten times in his adult life. *Id.* at ¶ 9.

This lawsuit is about his 2017 incarceration at the Cook County Jail. Specifically, it's about how the jail handled Hacker's significant hearing issues during his incarceration. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶¶ 2–6 (Dckt. No. 256).

In 2008, about a decade earlier, Hacker suffered hearing loss from ear infections while incarcerated at Shawnee Correctional Center. *Id.* at ¶ 14. The infections caused Hacker to completely lose hearing in his left ear and lose approximately 90 percent of his hearing in his right ear. *Id.* at ¶ 15. Hacker can hear a little if a person yells directly into his right ear and he cups the outer portion of his ear with his hand. *See* Defs.' Joint Resp. to Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 274). As a result, prison medical staff diagnosed Hacker with substantial hearing loss. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 11 (Dckt. No. 257).

In February 2017, Hacker arrived at the Cook County Jail. *Id.* at ¶¶ 14–15. The jail entered him into the Inmate Alert System as "Hearing Impaired" and assigned him to the

residential treatment unit on a medical tier. *Id.*; Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶ 24 (Dckt. No. 256).

In March 2017, only a month into his incarceration, Hacker's hearing impairment started causing him serious communication issues. The issues led to four grievances.

### *The First Grievance*

The first grievance involved the shoving incident.

On March 28, 2017, Hacker had a run-in with Correctional Officer Sandoval. Hacker alleges that he couldn't hear orders from Sandoval. *See* Pl.'s Statement of Additional Facts, at ¶ 2 (Dckt. No. 258). Because he couldn't hear the orders, he couldn't comply, and Sandoval pushed him for disobeying a verbal order. *Id.*; *see also* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶ 39 (Dckt. No. 256) ("Plaintiff had an incident with one of the officers at the jail on March 28, 2017, where Plaintiff alleges that the officer attacked him and threw him to the ground."). Sandoval's push left Hacker unconscious. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶ 40 (agreeing that "[a]s a result of the officer's hit, Plaintiff states that he experienced unconsciousness").

Hacker woke up in Cermak Health Services. *Id.* at ¶ 41. Hacker awoke handcuffed to the bed, surrounded by officers, and no one would communicate with him. *Id.* at ¶ 42.[1] Later that day, officers took Hacker to a doctor's office, where he couldn't hear what was said. The doctor talked normally to him, refusing to accommodate his hearing impairment, even after the

---

[1] In his statement of facts, Hacker often begins the paragraphs with phrases such as "Plaintiff states," "Plaintiff says," and so on. Defendants often responded with "Agree." It is not clear if Defendants are agreeing that Plaintiff *states* this or that, or agreeing with the underlying facts themselves. Even so, Plaintiff offered evidence that the underlying facts took place, so this Court takes them as true for purposes of this motion.

officer and Hacker informed the doctor of his disability. *Id.* at ¶ 48. Hacker didn't receive any treatment by Cermak for the shoving incident. *Id.* at ¶¶ 46, 49.

Right away, Hacker filed a grievance, Grievance 201704503. *Id.* at ¶ 50; *see also* Inmate Grievance 1 (Dckt. No. 247-7). The grievance alleged that Hacker "was assaulted by the officer on duty" when the officer "hit [Hacker] in [his] chest," causing him "to be thrown to the ground and hit [his] head on the wall." *See* Inmate Grievance 1, at 1 of 5. The grievance did not mention anything about Hacker's treatment, or lack thereof, at Cermak for the alleged assault. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶ 50 (Dckt. No. 256).

The Sheriff's Office responded in writing, informing Hacker that his "allegation(s) ha[d] been forwarded to the Offices of Professional Review and Divisional Superintendent for review and/or investigation," and that he could "follow-up with the Office of Professional Review." *See* Inmate Grievance 1, at 3 of 5 (Dckt. No. 247-7); Defs.' Joint Resp. to Pl.'s Statement of Additional Facts, at ¶ 26 (Dckt. No. 274).

The parties agree that Hacker did not sign the appeal portion of this response. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 65 (Dckt. No. 257); *see also* Inmate Grievance 1, at 4 of 5 (Dckt. No. 247-7). And signing and returning the appeal portion of the prison's response is required to exhaust administrative remedies. On July 10, 2017 (after Hacker filed this lawsuit), the Office of Professional Review ("OPR") issued a memorandum closing its investigation. *See* Defs.' Joint Resp. to Pl.'s Statement of Additional Facts, at ¶ 26 (Dckt. No. 274).

### *The Second Grievance*

The second grievance involved Hacker's access to an assistive listening device ("ALD").

4

The jail provides ALDs for programs and services (like drug treatment programs and court hearings) when requested, but they are not available for 24/7 use by an inmate. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 20 (Dckt. No. 257). The jail allows inmates to bring an approved personal ALD from home or purchase a personal ALD with their own funds to keep in their housing unit. *Id.* at ¶ 26.

Before his 2017 incarceration, Hacker used a personal ALD outside of incarceration. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶¶ 18–19 (Dckt. No. 256). He had three ALDs between 2008 and 2017. *Id.* at ¶ 19. But Hacker did not bring an ALD from home or try to purchase a personal ALD during his 2017 incarceration.

Instead, he only had access to an ALD for specific programs and services. The jail provided Hacker an assistive listening device to participate in a drug treatment program. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 43 (Dckt. No. 257). Additionally, jail ADA Coordinator Sabrina Rivero-Canchola identified Hacker as hearing impaired in her emails to court services personnel so that they could provide Hacker an assisted listening device for court hearings. *Id.* at ¶ 44.

The parties dispute how helpful ALDs are for Hacker. Hacker's Otolaryngologist, Dr. Caughlin, testified that "it would be very unlikely that [Hacker] would benefit from a hearing aid" as "just making sounds louder often makes it worse for [] patient[s]" with Hacker's degree of hearing loss. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶¶ 55–56 (Dckt. No. 256). Dr. Caughlin also stated that "it would [be] even less likely that [Hacker] would have any benefit from using an ALD if he is not even a good candidate for a hearing aid." *Id.* at ¶ 57.

Not so, Hacker argues. He offered evidence that he "always relies on an assistive listening device to hear," and "[w]ith a personal listening device Hacker is able to hear and

interact with others." *See* Pl.'s Statement of Additional Facts, at ¶ 3 (Dckt. No. 258). So he knows what he hears with his own ears.

On May 13, 2017, Hacker submitted a grievance about the lack of a hearing device. In Grievance 201707341, Hacker complained that the jail, ever since his arrival, didn't provide him "with [an] available hearing device to accommodate [his] disability in violation of the ADA." *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 66 (Dckt. No. 257); Inmate Grievance 2 (Dckt. No. 251-19).

The jail responded in writing, letting Hacker know that it had no obligation to provide a hearing device. "The ADA does not require us to provide you with a personal use device. You were provided with an assisted listening device during your participation in the drug treatment program. Captions are available on tv. Please advise us of any other accommodations you need at this time." *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 67 (Dckt. No. 257).

Hacker appealed the response, and his appeal was denied. *See* Inmate Grievance 2, at 2 of 2 (Dckt. No. 251-19).

After he filed this lawsuit, the jail also provided an ALD when Hacker met with his attorneys. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 46 (Dckt. No. 257). But the jail only provided an ALD after Judge Lee (this Court's predecessor before reassignment) granted a temporary restraining order requiring the jail to provide an ALD during meetings with counsel. *See* 9/12/17 Order (Dckt. No. 69).

### The Third Grievance

The third grievance involved his access to a special phone for people who are hearing-impaired, called a teletype phone ("TTY").

6

A TTY is a telecommunication device for the deaf that the jail used for inmates with hearing disabilities to make calls. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 47 (Dckt. No. 257). When a hearing-impaired person makes a TTY call, they set a telephone handset onto special acoustic cups built into the TTY or plug the TTY directly into the telephone line. *See, e.g.*, *What is a TTY?*, AboutTTY.com, abouttty.com (last visited September 21, 2021). Then, to communicate, they type a message onto the TTY keyboard. *Id.* The message is sent over the phone line, either in message format (if the other caller has a TTY) or through a Telecommunications Rely Service where an operator reads aloud written messages and types back responses. The hearing-impaired caller can read responses. *Id.* To use the TTY, an inmate must fill out an Inmate Request Form to request the TTY. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 51. The jail has a TTY in Hacker's residential treatment unit. *Id.* at ¶ 52.

On May 22, 2017, Hacker filed a grievance about the TTY policy. In Grievance 201707879, Hacker complained that due to the TTY policy, he could use the TTY only once a week for 30 minutes to call one person, while inmates without a hearing impairment could use the normal telephone several times a day for several hours. *See* Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 258); *see also* Defs.' Joint Resp. to Pl.'s Statement of Additional Facts, at ¶ 7 (Dckt. No. 274); Inmate Grievance 3 (Dckt. No. 256-6).

In its written response, the jail pointed out that there is no limit to TTY calls. *See* Inmate Grievance 3 (Dckt. No. 256-6). It depends on whether the person on the other end of the call can receive them. "There is no limit to the TTY calls. The person you are trying to reach must be available and willing to take the call. If they aren[']t the CRW will not bring you out for the

call." Inmate Grievance 3, at 2 of 2 (Dckt. No. 256-6). Hacker again appealed the response, and it was again denied. *Id.*

The parties dispute the extent of Hacker's telephone access. The Sheriff's Office offered evidence that Hacker made approximately 100 TTY calls during his incarceration and that they never denied Hacker's requests to make a TTY call. *See* Sheriff Defs.' Statement of Facts, at ¶¶ 48–49 (Dckt. No. 250). They claim that Hacker refused and denied multiple TTY calls. *Id.* at ¶ 50. In other words, Hacker had many opportunities to make and receive TTY calls, and chose to refuse and deny calls on multiple occasions.

Hacker points out that hearing inmates have daily access to telephones in their living units. *See* Defs.' Joint Resp. to Pl.'s Statement of Additional Facts, at ¶ 5 (Dckt. No. 274). But hearing-impaired inmates don't have access to a TTY in their living units. *Id.* He says that as someone with substantial hearing loss, the TTY policy severely limited his access to phone calls. *See* Pl.'s Statement of Additional Facts, at ¶¶ 6–8 (Dckt. No. 258). He had to wait for approval of his request and for a trained officer to use the TTY. *Id.*

### The Fourth Grievance

The fourth grievance involved medical care.

Hacker claims that his disability interrupts more than his communication. It also interferes with his medical care. Especially with receiving medication. Under normal residential treatment unit protocol, an officer calls out an inmate's name to get them for a medical appointment. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶ 27 (Dckt. No. 256). When the inmate hears their name, they get their ID and walk out the door. *Id.* Hacker says that this system caused him to miss medication.

On July 22, 2017, Hacker filed a medical grievance. In Grievance 201711877, Hacker complained that for over a year he'd had an ongoing tooth infection and pain because the medical staff didn't let him know when they came by for medication passes. *Id.* at ¶ 61; Inmate Grievance 4 (Dckt. No. 247-10). Due to his hearing impairment, Hacker said that he couldn't hear when they called, so he missed his medication. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶ 61 (Dckt. No. 256).

The parties don't dispute the underlying facts of this grievance. Between February 2017 and November 2017, jail medical providers treated Hacker more than 40 times, providing around 15 medications. *Id.* at ¶¶ 29–31. Hacker testified that there were times when he should have received treatment or medication, but he couldn't hear the officer call his name. *Id.* at ¶ 28. Additionally, Hacker testified that he had a tooth abscess that did not receive treatment because he missed medication for an infection, and could not hear when the staff called him to go to his dental appointment. *Id.* at ¶¶ 32–35.

Cermak Health Services responded to the grievance in July 2017, stating that the "patient received medication as written by MD on the date and time period cited on the grievance. Cerner documentation reflects patient awareness of prescribed medication cited in grievances as he received multiple consecutive doses prior to grievance date." *Id.* at ¶ 62.

However, Hacker didn't receive the grievance response until October 8, 2017. *Id.* at ¶ 63. He then began the appeal process. The appeal was denied on December 21, 2017. *Id.*

### Procedural History

Only four months into his 2017 incarceration, Hacker filed this suit. *See* Cplt. (Dckt. No. 1). He sued Cook County, Sheriff Dart, and two Sheriff's Office employees (jail ADA Coordinator Rivero-Canchola, and Corrections Officer Sandoval). *Id.*

9

Hacker's amended complaint, filed a month after his initial complaint, included five counts. *See* Am. Cplt. (Dckt. No. 27).

Count I is a claim against Cook County and Sheriff Dart under the ADA and the Rehabilitation Act relating to Hacker's substantial hearing impairment. *Id.* at ¶¶ 44–47.

Count II is a claim again Cook County and Sheriff Dart under the Religious Land Use and Institutionalized Persons Act of 2000. *Id.* at ¶¶ 48–50.

Count III is a deliberate indifference claim under the Fourteenth Amendment against Rivero-Canchola. *Id.* at ¶¶ 51–58.

Count IV is another claim against Cook County and Sheriff Dart under the ADA and the Rehabilitation Act. It involves "Leighton Ramps," ramps used to transport inmates between the jail and the Leighton Courthouse. *Id.* at ¶¶ 59–67.

Count V alleges that Officer Sandoval used unreasonable force in violation of the Fourteenth Amendment.[2] *Id.* at ¶¶ 68–72.

Cook County is a necessary party to the lawsuit – indemnifying the Sheriff for Counts I, II, and IV. Hacker also makes a substantive claim against the county related to Hacker's medical treatment in Count I. *Id.* at ¶¶ 4, 42.

After discovery, Defendants moved for summary judgment. *See* Dckt No. 245; Dckt. No. 248. In response, Hacker "acquiesce[d] to summary judgment" on Counts II and III. *See* Pl.'s Resp. to Defs.' Mtns. for Summ. J., at 1 (Dckt. No. 259). Hacker also agreed that Count IV should be dismissed without prejudice for failure to exhaust administrative remedies. *Id.*

Accordingly, this Court grants Defendants' motions for summary judgment on Count II (the claim under the Religious Land Use and Institutionalized Persons Act of 2000) and Count

---

[2] While the amended complaint does not refer to this claim as a section 1983 claim, the parties treat it as such and so does this Court.

III (the deliberate indifference claim under the Fourteenth Amendment). This Court also dismisses Count IV (the claim about the "Leighton Ramps" under the ADA and the Rehabilitation Act) without prejudice for failure to exhaust administrative remedies. *See Ford v. Johnson*, 362 F.3d 395, 401 (7th Cir. 2004).

Two claims remain: the ADA and the Rehabilitation Act claim against Cook County and Sheriff Dart (Count I), and the unreasonable force claim against Officer Sandoval (Count V). For the reasons discussed below, this Court grants summary judgment on both claims.

## Legal Standard

A district court "shall grant" summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine dispute of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The party seeking summary judgment has the burden of establishing that there is no genuine dispute about any material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). To survive summary judgment, the opposing party must go beyond the pleadings and identify specific facts showing the existence of a genuine issue for trial. *See Anderson*, 477 U.S. at 256.

The Court construes all facts and reasonable inferences in the light most favorable to the nonmoving party. *See Chaib v. Geo Grp., Inc.*, 819 F.3d 337, 341 (7th Cir. 2016). The Court does not weigh the evidence, judge credibility, or determine the truth of the matter, but rather determines only whether a genuine issue of triable fact exists. *See Nat'l Athletic Sportswear, Inc. v. Westfield Ins. Co.*, 528 F.3d 508, 512 (7th Cir. 2008). Summary judgment is appropriate if, on the evidence provided, no reasonable jury could return a verdict in favor of the non-

11

movant. *See Celotex Corp.*, 477 U.S. at 322; *Gordon v. FedEx Freight, Inc.*, 674 F.3d 769, 772–73 (7th Cir. 2012).

**Discussion**

In Count I, Hacker claims that Cook County and the Sheriff failed to accommodate his disability, depriving him of access to programs and services. Specifically, Hacker claims that the Sheriff's ALD and TTY access policies and Cook County's medication and medical care policies violated his rights under the ADA and the Rehabilitation Act. In Count V, Hacker claims that Office Sandoval used unreasonable force in violation of the Fourteenth Amendment.

Hacker is a prisoner, so he must satisfy the requirements of the Prison Litigation Reform Act. One requirement is the exhaustion of administrative remedies. Another requirement is the existence of physical injuries before bringing a claim for mental or emotional injuries.

Hacker's case suffers from both problems. He did not exhaust his administrative remedies. And his claim about technology access – such as the unavailability of TTY machines and assistive listening devices – does not involve a physical injury and thus cannot give rise to damages for mental or emotional injuries.

Since the Prison Litigation Reform Act imposes a mandatory requirement for prisoners to exhaust of administrative remedies before suing, this Court starts with the exhaustion question. *See* 42 U.S.C. § 1997e(a); *Pavey v. Conley*, 544 F.3d 739, 740 (7th Cir. 2008).

I. **Administrative Exhaustion**

Hacker failed to exhaust his administrative remedies for some, but not all, of his claims. Again, Hacker has two claims remaining: (1) the claim under the ADA and the Rehabilitation Act about the jail's ALD and TTY access, and about Cook County's medical care (Count I); and (2) the Fourteenth Amendment claim about Officer Sandoval's push (Count V). Count I covers

12

the second, third, and fourth grievances, and Count V covers the first grievance.

Hacker failed to exhaust his administrative remedies for the part of his claim under the ADA and the Rehabilitation Act about Cook County's medical care (meaning the fourth grievance, as covered in Count I). Hacker also failed to exhaust his remedies for his claim under the Fourteenth Amendment about the push (meaning the first grievance, as covered in Count V). Since he didn't exhaust his administrative remedies, he cannot bring these claims to the courthouse.

The Prison Litigation Reform Act requires prisoners exhaust all available administrative remedies before bringing an action under section 1983 or any federal law. *See* 42 U.S.C. § 1997e(a); *Pavey*, 544 F.3d at 740.

The language of the statute is "mandatory." *Ross v. Blake*, 136 S. Ct. 1850, 1856 (2016). An inmate "shall" bring "[n]o action" without first exhausting administrative remedies. *See* 42 U.S.C. § 1997e(a). The statutory text leaves no room for judge-made exceptions. *See Ross*, 136 S. Ct. at 1856–57. Judicial discretion is out the door. *Id.* "Time and again," the Supreme Court "has taken such statutes at face value – refusing to add unwritten limits onto their rigorous textual requirements." *Id.* at 1857.

To exhaust administrative remedies, a prisoner must file a grievance and follow the specific procedures laid out in the prison's administrative rules from start to finish. *See King v. McCarty*, 781 F.3d 889, 893 (7th Cir. 2015) ("A prisoner must comply with the specific procedures and deadlines established by the prison's policy."), *overruled on other grounds by Henry v. Hulett*, 969 F.3d 769 (7th Cir. 2020); *see also Dole v. Chandler*, 438 F.3d 804, 809 (7th Cir. 2006); *Pozo v. McCaughtry*, 286 F.3d 1022, 1025 (7th Cir. 2002). Courts strictly interpret the PLRA's exhaustion requirement. *See Pyles v. Nwaobasi*, 829 F.3d 860, 864 (7th Cir. 2016).

A "sue first, exhaust later" approach is not acceptable. *Chambers v. Sood*, 956 F.3d 979, 984 (7th Cir. 2020). In fact, "[u]nexhausted claims are procedurally barred from consideration." *Pyles*, 829 F.3d at 864.

The exhaustion requirement isn't pointless red tape, or a banal technicality – it's an important public policy that promotes the meaningful resolution of disputes. It requires prisoners to put the state on notice about their concerns, and gives the state a chance to solve problems before they're subjected to litigation. *See Jones v. Bock*, 549 U.S. 199, 219 (2007); *Woodford v. Ngo*, 548 U.S. 81, 95 (2006). Inmates must allow the administrative process to run its course before running to the courthouse. Litigation is the last stop, not the first step.

Failure to exhaust is an affirmative defense, so Defendants have the burden of proof. *See Jones*, 549 U.S. at 216. "Procedurally speaking, the Seventh Circuit has instructed the district courts in this circuit that as a matter of best practices, the issue of exhaustion should be resolved at the start of the case, before pretrial discovery begins." *Bruce v. Ghosh*, 2015 WL 1727318, at *4 (N.D. Ill. 2015) (citing *Pavey*, 544 F.3d at 742). A court usually resolves exhaustion issues through a *Pavey* hearing. *Id.*

Given *Pavey*'s holding that "exhaustion is not a question for the jury at trial," the Court is now left with two options. *See Wagoner v. Lemmon*, 778 F.3d 586, 592 (7th Cir. 2015). The Court can deny the motion for summary judgment without prejudice and conduct a *Pavey* hearing. *Id.* at 588; *Roberts v. Neal*, 745 F.3d 232, 234 (7th Cir. 2014). Or, "if the court can resolve the question of exhaustion based on the . . . documentary evidence," a hearing is "unnecessary" and the Court may simply rule on the motions. *See Nesbitt v. Villanueva*, 2011 WL 737617, at *3 (N.D. Ill. 2011).

As a reminder, Hacker filed four grievances that underly this suit. For two of the

grievances – Hacker's grievance about ALD access (*i.e.*, the second grievance) and TTY access (*i.e.*, the third grievance) – the parties agree that Hacker appealed, and the jail later denied his appeal. These two grievances satisfy PLRA's exhaustion requirement.

But the parties dispute whether Hacker exhausted the administrative remedies for the other two grievances, the grievance against Officer Sandoval (*i.e.*, the first grievance) and the medical grievance (*i.e.*, the fourth grievance). The underlying facts for these two grievances are not disputed, so there is no need for a *Pavey* hearing. The undisputed facts demonstrate that Hacker did not exhaust his administrative remedies on his grievance against Officer Sandoval or the medical grievance.

### A.    Prison Grievance Policy

A prisoner must file a grievance and follow the specific procedures laid out in the prison's administrative rules from start to finish to exhaust administrative remedies. So the Court will start by giving a preview.

The Cook County Department of Corrections has a formal grievance process. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶ 72 (Dckt. No. 256). The process is included in the inmate handbook that Hacker received upon his incarceration. *Id.*; *see also id.* at ¶ 75 ("Plaintiff testified that he signed a jail history card acknowledging receipt of an inmate handbook and testified that the handbook covered the procedures for filing grievances.").

For most events, the grievance process requires a detainee to file a grievance within 15 days of the alleged grievable offense using an "Inmate Grievance/Response Form." *Id.* at ¶ 73. On this form, the detainee must include the "specific date, location and time of the incident, problem or event" that they are grieving. *Id.*

After filing a grievance, inmates receive a written response, typically within 15 days of receipt of the grievance unless an exception applies. *See* Inmate Handbook, at 26 of 34 (Dckt. No. 247-9). The grievance process then requires an unsatisfied detainee to appeal the grievance response to exhaust their administrative remedies. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶ 74 (Dckt. No. 256). To appeal, an inmate must file an appeal by signing and returning the appeal portion of the response within 15 days of receiving the jail's response. *See* Inmate Handbook, at 26 of 34 (Dckt. No. 247-9).

The language regarding the appeals process is located on the grievance response form in addition to in the handbook. *See* Pl.'s Resp. to Def. Cook County's Statement of Facts, at ¶ 74 (Dckt. No. 256).

Neither the handbook nor the grievance form explains how the appeal process differs, if at all, if the grievance is forwarded to OPR.

**B.    The First Grievance (about the Shove)**

Defendant Sandoval argues that Hacker failed to exhaust his administrative remedies on his excessive force claim. *See* Sheriff's Office Defs.' Mtn. for Summ. J., at 14–16 (Dckt. No. 249). Specifically, Sandoval argues that Hacker failed to appeal the jail's written response, which noted that his grievance was forwarded to OPR. *Id.*; *see also* Sheriff Defs.' Statement of Facts, at ¶ 65 (Dckt. No. 250).

Hacker agrees that he did not appeal. But he argues that he didn't need to. Hacker points out that the written response (*i.e.,* the document that he needed to appeal) indicated that OPR would be investigating, and that he could follow-up with OPR. In his view, that statement shows that he did not have an available administrative remedy to appeal. *See* Pl.'s Resp. to Defs.'

16

Mtns. for Summ. J., at 14–16 (Dckt. No. 259); Pl.'s Statement of Additional Facts, at ¶ 27 (Dckt. No. 258).

Instead, Hacker says that an inmate may not appeal a grievance forwarded to OPR until OPR completes an investigation. He says an inmate "not satisfied with an OPR investigation has a right to appeal the 'written conclusion to the grievance' after OPR comes back with a final determination." *Id.* at ¶ 26. Also, Hacker – relying on testimony from an unrelated 2014 case – claims that an OPR investigation is not complete until "Command Channel Review" is complete. *Id.* He says that Sandoval failed to present evidence of when the investigation was considered by the Command Channel Review and, thus, when Hacker could appeal. *See* Pl.'s Resp. to Defs.' Mtns. for Summ. J., at 15 (Dckt. No. 259).

Hacker failed to exhaust his administrative remedies because he *never* appealed at all. That is, he didn't appeal before the OPR finished its investigation, and he didn't appeal after the OPR finished its investigation. He didn't appeal, so he didn't exhaust.

Courts disagree over how a referral to OPR impacts the timing of an appeal for a grievance. Specifically, courts disagree about whether a referral to OPR suspends the normal procedure and defers an appeal. Simply put, if the OPR opens an investigation, can an inmate wait to appeal the denial of a grievance until the OPR is done?

Under one approach, an inmate must appeal a response that refers the grievance to OPR right away, without waiting for the OPR to do its thing. Under the other approach, the referral suspends the appeal requirement until OPR wraps up its investigation.

Courts are split on the timing question. In *Johnson v. Cook County Jail*, 2015 WL 2149468 (N.D. Ill. 2015), the court held that a response referring the matter to OPR doesn't impact the appeal process. *Id.* at *4. Instead, to exhaust administrative remedies, a plaintiff

must appeal a response indicating a referral to OPR, without waiting. *Id.* This conclusion rests on the Seventh Circuit's holding that participating in a prison internal affairs investigation (the precursor to OPR) is not the same as, and not a substitute for, following the prison's grievance policy. *Id.* (citing *Pavey*, 663 F.3d at 905). Thus, an OPR investigation is not a substitute for the grievance policy and does not count as a grievance. So it does not delay the need to appeal.

Other courts take a different approach. Some courts in this district have held that responses like the one at issue here do "not indicate a particular disposition" of the grievance. *See Smith v. Cook County*, 2017 WL 3278914, at *6 (N.D. Ill. 2017); *see also Jackson v. Cook Cty. Sheriff Thomas Dart*, 2016 WL 5390954, at *3 (N.D. Ill. 2016). "It defies common sense to read that response [informing the inmate that his grievance was being forwarded to OPR] as negative action on his grievance, such that an appeal was appropriate." *Jackson*, 2016 WL 5390954, at *3.

Under that approach, if the response contained "an indication that the grievance was not sustained and had the superintendent signed it, then an appeal would have been appropriate." *Smith*, 2017 WL 3278914, at *6. But if it doesn't, then there is no reason for an inmate to appeal right away, because review is ongoing, and a "failure to do so does not mean that he failed to exhaust his administrative remedies." *Id.*

So, Hacker could either appeal the response right away, or he could give "the process a chance to work" and wait for a response from OPR. *See Crayton v. Graffeo*, 10 F. Supp. 3d 888, 895 (N.D. Ill. 2014) (quoting *Worthem v. Boyle*, 404 F. App'x 45, 46 (7th Cir. 2010)). But, even if Hacker decided to wait, he still must appeal at *some point*. Inmates still have to "follow[] through with administrative appeals." *Worthem*, 404 F. App'x at 46. The existence of an OPR investigation does not eliminate the need to appeal at all.

18

Hacker's claim fails because he *never* appealed. Hacker did not appeal the original response. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 65 (Dckt. No. 257). And Hacker didn't try to appeal after OPR finished their investigation.

Under either approach, Hacker has failed to exhaust his administrative remedies. If plaintiffs must appeal the response referring the grievance to OPR, he loses. He didn't appeal when the matter was referred to the OPR. But under the other approach, Hacker still loses. He could have waited until OPR completed the investigation. But waiting doesn't eliminate the appeal requirement altogether. He didn't appeal when the OPR was done.

Hacker's theory is that under the second approach he never had to appeal. He says that by waiting for OPR to complete the investigation, he couldn't appeal after OPR finished because more than 15 days had passed from receiving his grievance response. Hacker says that the OPR investigation doesn't change the time limit to appeal within 15 days of receiving a response (the referral to OPR). Ultimately, under Hacker's theory, if an OPR investigations takes more than 15 days, the OPR referral eliminates the appeal requirement. Hacker cannot turn the 15-day requirement on its head, and turn it into a tool that eliminates the need to appeal altogether.

The question of *when* Hacker needed to appeal is different than *whether* he needed to appeal. He needed to appeal, one way or the other, but he simply didn't. He didn't appeal when the OPR was investigating, and he didn't appeal when the investigation was over. He didn't appeal, so he didn't exhaust.

It's appropriate for Hacker to give "the process a chance to work," but that does not excuse his requirement to "follow[] through with administrative appeals" before filing suit. *Worthem*, 404 F. App'x at 46. Waiting for the OPR investigation tolls the time in which to

19

appeal. An OPR investigation suspends the underlying grievance, but does *not* eliminate the appeal requirement.

Hacker failed to appeal *at all*, even after OPR closed the investigation. As a result, Hacker failed to exhaust his administrative remedies. Thus, this Court dismisses Count V without prejudice for failure to exhaust administrative remedies.

### C. The Fourth Grievance (about the Medical Care)

Cook County argues that the PLRA also bars Hacker's claim under the ADA and the Rehabilitation Act for medical treatment because Hacker failed to exhaust his administrative remedies. *See* Def. Cook County's Mtn. for Summ. J., at 10–12 (Dckt. No. 246).

Cook County manages Cermak Health Services, which provides medical care to the Cook County Department of Corrections and is a separate entity from the Sheriff's Department. Specifically, Cook County argues that Hacker filed his only medical grievance only a few days before amending his complaint. *Id.* As a result, Hacker had not received a response, let alone appealed that response and exhausted his remedies, until after filing this lawsuit.

Hacker does not dispute that he filed his medical grievance on July 22, 2017, over a month after initiating this lawsuit and only three days before amending his complaint. Hacker didn't receive the response until October 2017 and did not finish the appeals process until December 2017. Exhaustion must take place before, not after, filing suit.

Instead, Hacker argues his second grievance, the May 2017 ALD grievance, put Cook County on notice of Hacker's substantial hearing impairment. The May 13, 2017 grievance stated that the jail didn't provide Hacker "with [an] available hearing device to accommodate [his] disability in violation of the ADA." *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 66 (Dckt. No. 257).

20

But Hacker's substantive claim against Cook County is about their medical care. His ALD grievance didn't indicate any issues with medical care or an inability to hear medication-pass calls. This grievance cannot and did not place Cook County, the provider of his medical care, on notice of any issues.

Only Hacker's July 2017 grievance made any reference to the medical care that Cook County provided. And this grievance was not exhausted before Hacker filed suit or even amended his complaint. The statute is clear that the exhaustion requirement is "mandatory" and a "sue first, exhaust later" approach is not acceptable. *See Ross*, 136 S. Ct. at 1856; *Chambers*, 956 F.3d at 984. Since Hacker sued first, he failed to exhaust his administrative remedies.

This Court dismisses Count I about medical care by Cook County without prejudice for failure to exhaust administrative remedies.

In sum, Hacker failed to exhaust administrative remedies for two grievances, the grievance about Officer Sandoval's push and the grievance about Cook County's medical care. As a result, part of Count I – the substantive claim against Cook County – and all of Count V are dismissed without prejudice for failure to exhaust administrative remedies.

## II.    Physical Injury

Hacker did exhaust his administrative remedies for two of his grievances – the grievance about ALD access (*i.e.*, the second grievance) and TTY access (*i.e.*, the third grievance). These grievances make up the remaining portion of his claim under the ADA and the Rehabilitation Act (Count I). But Hacker faces another roadblock. Hacker failed to produce evidence of any physical injury.

The PLRA provides that "[n]o Federal civil action may be brought by a prisoner confined in a jail, prison, or other correctional facility, for *mental or emotional injury* suffered while in

custody without a prior showing of physical injury . . . ." *See* 42 U.S.C. § 1997e(e) (emphasis added). This physical injury requirement only applies to prisoners, those confined in a jail, prison, or other correctional facilitation, at the time the litigation begins. *See Kerr v. Puckett*, 138 F.3d 321, 323 (7th Cir. 1998); *see also Phipps v. Sheriff of Cook Cty.*, 681 F. Supp. 2d 899, 909 (N.D. Ill. 2009). Hacker was incarcerated when he brought this suit, so the PLRA's physical injury requirement applies to his claim.

The Seventh Circuit has interpreted this provision to limit an inmate from seeking compensatory damages for mental or emotional injuries without establishing a physical injury. *See Calhoun v. DeTella*, 319 F.3d 936, 940 (7th Cir. 2003); *see also Lisle v. Welborn*, 933 F.3d 705, 719 (7th Cir. 2019); *Cassidy v. Ind. Dep't of Corrs.*, 199 F.3d 374, 376–77 (7th Cir. 2000); *Zehner v. Trigg*, 133 F.3d 459, 462 (7th Cir. 1997). But it does not bar lawsuits altogether. Instead, section 1997e(e) bars damages for mental and emotional injuries, while allowing a prisoner to pursue other claims for damages, including punitive and nominal damages, and injunctive relief. *See Thomas v. Illinois*, 697 F.3d 612, 614 (7th Cir. 2012); *Washington v. Hively*, 695 F.3d 641, 644 (7th Cir. 2012); *Santiago v. Franklin*, 2021 WL 1030406, at *2 (N.D. Ill. 2021) (citing *Calhoun*, 319 F.3d at 940); *Robinson v. Page*, 170 F.3d 747, 748 (7th Cir. 1999).

The PLRA's physical injury requirement applies to all claims, even the ADA and Rehabilitation Act claims. *See Cassidy*, 199 F.3d at 376–77 (applying the physical injury requirement to ADA claims); *Phipps*, 681 F. Supp. 2d at 909 (applying the physical injury requirement to ADA and Rehabilitation Act claims).

The Sheriff's Office argues that Hacker has only provided examples of mental or emotional injuries, stating his hearing loss is "stressful" and that it brings "uncomfortableness."

*See* Sheriff's Office Defs.' Mtn. for Summ. J., at 14–16 (Dckt. No. 249). But Hacker has not provided evidence of any physical injuries from the lack of access to the technology.[3]

The Court agrees. Hacker failed to produce any evidence of any physical injury. And Hacker failed to respond to this argument in his brief. The jail's alleged failure to accommodate had merely mental and emotional effects. Hacker testified that his inability to communicate manifests itself through general feelings of stress, exhaustion, and uncomfortableness. *See* Pl.'s Resp. to Sheriff Defs.' Statement of Facts, at ¶ 21 (Dckt. No. 257). Stress, exhaustion, and uncomfortableness are not physical injuries. *See, e.g.*, *Cannon v. Burkybile*, 2000 WL 1409852, at *6 (N.D. Ill. 2000) (finding "headaches, insomnia, stress, and stomach anxiety do not sufficiently meet the physical injury requirement"); *Neas v. Eric*, 2020 WL 819296, at *3 (E.D. Wis. 2020) (finding post-traumatic stress disorder, nightmares, and anxiety attacks did not satisfy the physical injury requirement); *Perotti v. Quiones*, 2013 WL 4008188, at *2 (S.D. Ind. 2013) (finding emotional distress, humiliation, and post-traumatic stress disorder did not satisfy the physical injury requirement).

As a result, the PLRA bars Hacker's claim of recovery for mental and emotional damages. Again, Hacker's amended complaint *only* requested compensatory damages and injunctive relief for his claim under the ADA and the Rehabilitation Act. *See* Am. Cplt., at ¶ 72 (Dckt. No. 27). The PLRA bars the compensatory damages as they are solely for mental and emotional damages.

Hacker is not in a position to get injunctive relief, either. Hacker is no longer an inmate

---

[3] He did provide evidence of a shove with his Fourteenth Amendment claim, but that is separate from his claim under the ADA and the Rehabilitation Act. Just because there is a physical injury, the shove, in his complaint, it doesn't save the rest of his claims. Each claim requires a physical injury for compensatory damages.

at the Cook County Jail. Instead, he is currently in the custody of the Illinois Department of Corrections at Big Muddy River Correctional Center, a state institution not under Defendants' control. *See* Hacker Dep. (Dckt. No. 256-1); Defs.' Joint Resp. to Pl.'s Statement of Additional Facts, at ¶ 1 (Dckt. No. 274). Because Hacker is no longer in Defendants' custody, his request for injunctive relief is moot.

And even if Hacker pled punitive damages, he couldn't recover. Punitive damages may not be awarded in private suits brought under the ADA and Rehabilitation Act. *See Barnes v. Gorman*, 536 U.S. 181, 189–90 (2002). But he didn't, and he didn't request nominal damages either.

Hacker only asked for compensatory damages and injunctive relief. He cannot get either and is unable to recover in any way. Thus, Defendants' motions for summary judgment are granted for the remaining portion of Count I, meaning the claims under the ADA and the Rehabilitation Act about ALD and TTY access.

## III. Cook County

Hacker sued Cook County both as a necessary party to the lawsuit, indemnifying the Sheriff for Counts I, II, and IV, and made a substantive claim against Cook County related to Hacker's medical treatment in Count I.

Hacker acquiesced to summary judgment on Count II and agreed to dismiss Count IV for failure to exhaust his administrative remedies. This Court grants summary judgment for Sheriff Dart for Count I because Hacker does not have a physical injury. And this dismisses the substantive claim against Cook County in Count I for failure to exhaust administrative remedies.

As a result, none of Hacker's claims remain. There is nothing left for Cook County to indemnify, so its motion for summary judgment as a necessary party is granted.

**Conclusion**

For the reasons stated above, the Court grants the Defendants' motions for summary judgment.

Date:  September 24, 2021

_____

Steven C. Seeger
United States District Judge